PEOPLE v LEVERSEE

Docket No. 220571. Submitted October 10, 2000, at Grand Rapids. Decided November 21, 2000, at 9:00 A.M. Leave to appeal sought.

Troy C. Leversee was convicted by a jury in the Van Buren Circuit Court, William C. Buhl, J., of armed robbery, possession of a firearm during the commission of a felony, and first-degree home invasion. The court sentenced the defendant to consecutive terms of imprisonment of fifteen to thirty years for the armed robbery conviction, two years for the felony-firearm conviction, and five to twenty years for the home invasion conviction. The defendant appealed.

The Court of Appeals *held*:

1. The trial court, in denying the defendant's motion to suppress evidence of his statement to the police, did not err in finding that the defendant had waived his right to remain silent.

2. Evidence of the defendant's statement to the police should have been suppressed pursuant to *People v Bender*, 452 Mich 594 (1996). When the police are notified that counsel has been retained for a suspect, *Bender* requires that the police inform the suspect that counsel has been retained and is available. Failure to so inform a suspect before a confession is obtained requires the suppression of evidence of the confession. *Bender* applies to this case where, before the defendant gave his confession at the police station, the defendant's aunt placed a telephone call to the police station to inform the police that the defendant's attorney was on his way to the police station, but the message did not get to the interrogating officers until after they finished their questioning of the defendant. The Supreme Court should narrow *Bender*'s application to situations where the suspect's retained attorney contacts the police. Such a rule would be more practical to apply. The erroneous admission of the defendant's confession does not require reversal of his conviction in view of the overwhelming nature of the other evidence of guilt.

3. Error, if any, arising from the admission of evidence that a codefendant raped one of the victims was harmless in view of the overwhelming evidence of the defendant's guilt.

4. The evidence supported the trial court's scoring of several offense variables under the sentencing guidelines. The trial court did not err in scoring ten points under the sentencing guidelines for Offense Variable 16, property obtained, damaged, lost, or destroyed, MCL 777.46(1); MSA 28.1274(56). At the time the defendant was sentenced, the statute assessed points based in part on the value of destroyed property. The Legislature has since amended the statute so that it now assesses points based on the value of property. The trial court recognized that the statute, as previously worded, contradicted itself by seemingly including only the value of destroyed property. The trial court correctly determined legislative intent for scoring ten points under the circumstances of this case.

Affirmed.

CRIMINAL LAW — EVIDENCE — CONFESSIONS — RIGHT TO COUNSEL.

Evidence of a suspect's confession to the police must be suppressed where the police fail to inform the suspect before the confession that counsel was retained for the suspect and is available for consultation.

*Jennifer M. Granholm*, Attorney General, *Thomas L. Casey*, Solicitor General, *Juris Kaps*, Prosecuting Attorney, and *J. Ronald Kaplansky*, Assistant Attorney General, for the people.

*Margol and Kirkpatrick, PLC* (by *Nancy L. Kirkpatrick*), for the defendant.

Before: FITZGERALD, P.J., and HOOD and MCDONALD, JJ.

MCDONALD, J. Following a jury trial, defendant was convicted of armed robbery, MCL 750.529; MSA 28.797, possession of a firearm during the commission of a felony, MCL 750.227b; MSA 28.424(2), and first-degree home invasion, MCL 750.110a(2); MSA 28.305(a)(2). The trial court sentenced defendant to fifteen to thirty years' imprisonment for the armed robbery conviction, two years' imprisonment for the felony-firearm conviction, and five to twenty years'

imprisonment for the home invasion conviction. The trial court ordered that defendant's sentence for the armed robbery conviction be served consecutively to the felony-firearm conviction, and that defendant's sentence for the first-degree home invasion conviction be served consecutively to his sentences for armed robbery and felony-firearm. Defendant appeals as of right. We affirm.

On the evening of January 24, 1999, the victims, a married couple, were roused from sleep in their living room by a knock on their front door. When the wife answered the door, a young man, whom she later identified as defendant, asked to use the telephone to call a wrecker because he had driven his car into a ditch. Defendant came into the house and followed the wife into the living room. The front door remained partially open. The wife handed defendant the telephone, and he dialed, but then hung up. At that point, another man, later identified as Christopher Henley, came running in through the front door, wearing an orange stocking cap over his face and carrying a 12-gauge shotgun. Henley was yelling at them to get down on the floor.

The wife obeyed the order to get down on the floor, and the husband put his forehead down on the table where he was seated. Henley repeatedly demanded "where's the stuff?" The husband told Henley he did not know what Henley was talking about and offered Henley money from his wallet, which was on the counter. Henley grabbed the husband by the arm, lifted him out of the chair, and led him over to the counter. The husband took $20 from his wallet and gave it to Henley. The husband also gave Henley a few dollars from his wife's purse. While the hus-

band gave the money to Henley, defendant was standing by the wife. Defendant had a knife, but his arm was at his side.

Henley continued to ask where was "the stuff" and "the rest" of the money. The husband told Henley there was nothing else in the house and offered to take Henley to inspect the garage to show there was nothing there. Henley agreed and instructed defendant to watch the wife while he went with the husband to the garage. While they were in the garage, the husband grabbed the shotgun and tried to get it away from Henley. During the struggle for the shotgun, the stocking cap came off Henley and the gun went off. Henley and the husband continued to struggle for control of the shotgun, ending up outside the garage. Henley called defendant for help. Defendant took the wife's .410 shotgun from the corner in the living room and ran outside. The husband saw somebody coming out of the house carrying a long object. The husband felt something hard strike him on the face, saw stars, and let go of the shotgun.

The wife testified that defendant came back inside the house first. He did not bring her .410 shotgun with him into the house. Henley escorted the husband back inside the house. The husband had a long cut on his cheek. Henley threw the husband facedown onto the floor near the wife. Defendant tied the wife's hands behind her back with electrical cords that had been cut from the victims' appliances. Henley tied the husband's hands behind his back. At some point, Henley poked the husband in the back of the head with the shotgun and struck him on the left side of the head with the stock of the shotgun. Henley continued to ask about "the stuff" and went through various

objects in the house. The husband also heard ransacking in other parts of the house. The wife asked Henley if he meant money, and she told him there was money in their home office. Henley took the wife into the office and retrieved about $100 to $122 in cash. After they returned from the office, Henley indicated he was going to rape the wife and told defendant to "cut" the husband if he moved. Henley took the wife into the office and raped the wife. The wife testified that defendant came into the office twice during the rape. Once defendant said "Chris, Chris, what are you doing, let's go" and the second time asked if he could watch, saying he had never seen anything like that before. Henley told defendant to get out.

After the rape, Henley took the wife back out to the living room and threw her on the ground. Henley taunted the husband about the rape and poked the wife in the back of the head with the barrel of the shotgun. Then defendant and Henley left the house. Henley briefly returned and threatened to kill them if they moved or called the police. After Henley left again, the victims heard a car running outside. The husband thought it sounded like the car was at the end of their driveway. The victims untied themselves, locked the doors, and called the police.

The victims noticed that approximately $180 in cash, two $100 gift certificates, a .44 magnum pistol, a .22 caliber Smith & Wesson pistol, a .22 caliber rifle, a .410 pump shotgun, a double-barrel black powder gun, and an eighteen-pack of Ice House beer were missing from their home after defendant and Henley left.

Four days after the crime, on January 28, 1999, defendant was arrested at his home. Defendant was taken to the jail and, later that morning, made a taped statement admitting his involvement in the crime.

Defendant's first argument on appeal is that the trial court erred in admitting evidence of his statement to the police. Defendant first claims his statement should have been suppressed because he had invoked his right to remain silent at the time of his arrest. We disagree.

At a hearing on defendant's motion to suppress his statement, defendant testified that his mother was at his home when he was arrested. Detective Stump testified that he could sense tension because of the presence of defendant's mother. After he advised defendant of his *Miranda*[1] rights, Detective Stump stated that he told defendant he could tell defendant was uncomfortable speaking in front of his mother. According to Detective Stump, defendant agreed, and Detective Stump then stated "you know we have got an incident that we need to talk about." Detective Stump testified that defendant replied "yes, I know what that is. But I didn't hurt anything, anybody." Detective Stump testified that defendant never indicated that he wanted an attorney or that he did not want to talk to the police. Defendant admitted that Detective Stump advised him of his *Miranda* rights. Defendant claimed that he told Detective Stump that he was aware of his rights and did not wish to speak. The trial court considered these discrepancies in the testimony and found that defendant waived his rights. The trial court's factual finding was not clearly erro-

---

[1] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

neous, and we will not disturb it. *People v Abraham*, 234 Mich App 640, 644; 599 NW2d 736 (1999).

Defendant also argues his statement should have been suppressed under *People v Bender*, 452 Mich 594, 597; 551 NW2d 71 (1996). We agree, but find that the error was harmless and does not require reversal of defendant's conviction.

Defendant was arrested at 7:10 A.M. Defendant's aunt, Judith Chamberlain, testified that after she learned of defendant's arrest, she called the office of attorney Frederick Taylor and was told that Taylor was not in the office, but that he would call her in about fifteen minutes. Chamberlain called Taylor's office again about fifteen minutes later and spoke to Taylor. Taylor agreed to represent defendant. The initial retainer fee was $300. Taylor and Chamberlain made arrangements to meet "in Paw Paw." It is not clear from the record whether they were to meet at the jail or at the home of Chamberlain's father, where Chamberlain placed the calls. After speaking to Taylor, Chamberlain called the jail and told the unidentified male who answered the phone that defendant's lawyer was on the way and that defendant should be told his lawyer was coming. A telephone bill admitted into evidence indicates that the call to the jail was made at 10:02 a.m. However, the message that an attorney had been retained was not relayed to defendant. At some point, attorney Taylor did arrive at the jail, but there is no evidence in the record indicating the time of his arrival.

Detective Stump testified that defendant was brought from a holding cell to Detective Lieutenant Rider's office at about 10:00 A.M. Detective Stump advised defendant that they wanted to speak with

him and asked defendant if he understood the *Miranda* rights read to him at his home. Detective Stump also told defendant he wanted to tape record their conversation. Defendant indicated that he understood his rights and did not have a problem with the conversation being recorded. The taped statement began at 10:10 A.M. and ended at 11:30 A.M. Detective Stump and Detective Lieutenant Rider each testified that they had no knowledge that an attorney had been retained for defendant until the statement was completed. Detective Stump testified that after the statement was finished, he checked his voice mail, which contained a message that defendant's attorney had arrived at the jail. Detective Stump did not recall what time the message was received. Detective Stump and Detective Lieutenant Rider both testified that defendant's attorney was at the jail when they finished taking defendant's statement.

In *Bender, supra* at 620-621, the Michigan Supreme Court adopted a prophylactic rule that requires the police to inform suspects for whom counsel have been retained about the availability of counsel for them. The failure to so inform suspects requires suppression of any statements made by the suspects. *Id.* In *Bender*, two defendants, Zeigler and Bender, were arrested for stealing bicycles. After Zeigler was arrested, his mother retained an attorney who instructed her to go to the police station to deliver a message to Zeigler on the attorney's behalf. *Id.*, 598-599. Zeigler's mother went to the police station, asked to see her son, and told the officer that she had a message for her son from his attorney. *Id.* After Bender was arrested, his father retained an attorney who called the police station and asked to speak with

Bender. *Id.*, 600. The police did not inform Zeigler and Bender that attorneys were trying to contact them. After signing waivers of their *Miranda* rights, Zeigler and Bender were each interrogated and made incriminating statements. *Id.* at 599-601.

We note that in *People v Sexton*, 458 Mich 43, 53; 580 NW2d 404 (1998), the Supreme Court characterized the holding of *Bender* as requiring suppression of statements made "after the attorney's arrival." However, we do not read *Bender* that way. Zeigler's attorney never arrived at the station, but four justices agreed that the trial court properly suppressed his statement. *Bender, supra* at 620-621. The statement in *Sexton, supra,* was made in dicta. There, the issue was whether *Bender, supra,* should be applied retroactively. *Sexton, supra* at 45. Furthermore, in *Sexton, id.* at 49, n 7, the Supreme Court "note[d] without comment" that only three justices agreed that telephone contact was sufficient to invoke the protection of *Bender*. We assume this comment refers to the following statement in the lead opinion, written by Justice CAVANAGH: "[W]e do not limit this rule by requiring the attorney's physical presence at the police station." *Bender, supra* at 617. While Chief Justice BRICKLEY's concurrence does not specifically address this statement, Chief Justice BRICKLEY wrote that he agreed that both of the defendants' statements should be suppressed. *Id.* at 620. Bender's attorney contacted the police station by telephone. *Id.* at 600. Accordingly, we believe that four justices did find telephone contact to be sufficient to invoke the protection of *Bender*. The Court recognized that the issue whether telephone contact was sufficient was not before it in *Sexton, supra* at 49, n 7. Accordingly, we believe we

must follow *Bender* as it was written, and not as interpreted in *Sexton*. We do urge the Supreme Court to clarify whether it intended to modify its holding in *Bender* by its comments in *Sexton*.

We see no reason why we should not apply *Bender* to this case. As we have already explained, we believe four justices found that telephone contact was sufficient to invoke the protection of *Bender*. *Bender* also held that the per se rule applied when a family member, not the retained attorney, made the contact with the police station. In light of these facts, we see nothing to distinguish *Bender* from the situation presented in this case. Under *Bender*, after receiving Chamberlain's telephone call, the police should have informed defendant that counsel had been retained for him and was on the way to the police station.[2]

The trial court in this case held that *Bender* did not apply because the interrogating officers did not have knowledge of Chamberlain's telephone call. We agree that the evidence shows neither Detective Stump nor Detective Lieutenant Rider knew that defendant's family had retained an attorney for defendant. However, there is no indication that the Supreme Court intended to so limit *Bender*. In *Bender*, neither Zeigler's mother nor Bender's attorney spoke directly to the interrogating officer when they contacted the police station. *Id.* at 598-600. Moreover, in *Bender*, the Court refers to "the police" or "police" as an entity throughout its opinion. See *id.* at 597, 605, 614-617, 620. Footnote twenty-four states "the police, as an entity, have the fundamental responsibility to

---

[2] There was no evidence in the record regarding the precise time counsel arrived at the police station.

establish and maintain adequate procedures that will allow an attorney to communicate with a suspect and the interrogating officers without unreasonable delay." *Id.* at 617-618, n 24. Finally, we note that if the rule were otherwise, a police agency could simply insulate the interrogating officers and avoid the requirements of *Bender*.

Although we must apply *Bender* in this case, we urge the Supreme Court to narrow this rule. In our view, the protection of *Bender* should not be invoked unless contact with the police has been made by the retained attorney. We believe such a rule would be more practical to apply. Not only could the police easily verify whether the individual placing the call is in fact an attorney, but this rule would also guard against family members calling before an attorney is actually retained, for example in situations where representation is contingent upon receipt of a retainer fee.

Although we believe the trial court erred in admitting defendant's statement into evidence in this case, we find the error harmless. The evidence of defendant's guilt in this case was overwhelming. Not only did the wife positively identify defendant, but a friend of defendant's, Anthony Sams, who was with defendant, Henley, and Dale Kirby,[3] on the day of the crime also provided key testimony against defendant. Among other things, Sams testified that defendant told Sams that defendant and Henley went into the victims' residence and stole money and weapons, and that Henley raped the wife. Accordingly, reversal is

---

[3] Apparently, Kirby drove Henley and defendant to and from the victims' residence.

not required on this basis. See *People v McRunels*, 237 Mich App 168, 184-185; 603 NW2d 95 (1999).

Next, defendant argues the trial court erred in admitting over defendant's objection evidence that Henley raped the wife. Although defendant was initially charged with first-degree criminal sexual conduct, the district court dismissed this charge following the preliminary examination. The prosecution did not appeal the bindover decision.

Defendant argues the evidence of the sexual assault was irrelevant to the charges against him and was highly prejudicial. A trial court's decision to admit evidence is reviewed by the Court of Appeals for abuse of discretion. *People v Starr*, 457 Mich 490, 494; 577 NW2d 673 (1998). Even if we were to find the trial court abused its discretion, any error was harmless in light of the overwhelming evidence of defendant's guilt. *People v Mateo*, 453 Mich 203, 220-221; 551 NW2d 891 (1996).

Finally, defendant argues he is entitled to resentencing because the trial court erred in scoring the sentencing guidelines. The statutory sentencing guidelines apply to this case because the crimes were committed after January 1, 1999. MCL 769.34(1) and (2); MSA 28.1097(3.4)(1) and (2); *People v Oliver*, 242 Mich App 92, 99; 617 NW2d 721 (2000). This Court shall affirm sentences within the guidelines range absent an error in scoring the sentencing guidelines or inaccurate information relied on in determining the defendant's sentence. MCL 769.34(10); MSA 28.1097(3.4)(10). Defendant properly preserved this issue for appeal by raising it at sentencing below. *Id.*

Defendant challenges the trial court's scoring of offense variable three (OV 3), physical injury to a vic-

tim, MCL 777.33; MSA 28.1274(43), offense variable four (OV 4), psychological injury to a victim, MCL 777.34; MSA 28.1274(44), offense variable seven (OV 7), aggravated physical abuse, MCL 777.37; MSA 28.1274(47), and offense variable sixteen (OV 16), property obtained, damaged, lost, or destroyed, MCL 777.46; MSA 28.1274(56). After review of the entire record, we find the trial court's scoring of the guidelines was supported by the evidence. *People v Elliott*, 215 Mich App 259, 261-262; 544 NW2d 748 (1996); *People v Johnson*, 202 Mich App 281, 288; 508 NW2d 509 (1993).

Only one of defendant's arguments, concerning OV 16, merits comment. The statute indicates that "[o]ffense variable 16 is property *obtained*, damaged, lost, or destroyed." MCL 777.46(1); MSA 28.1274(56)(1), (emphasis added). At the time defendant was sentenced, the statute then assessed points based in part on the value of "the *destroyed* property." (Emphasis added.) The Legislature has since amended the statute so that it now assesses points based on the value of "the property." The trial court scored five points, under subsection 46(c), for a value of "$1,000.00 or more but not more than $20,000.00." The trial court's determination included guns taken from the victims that were eventually returned undamaged to them. Defendant argues the only amount that should have been considered under OV 16 was for property destroyed, which was agreed to be under $1,000. The trial court recognized the statute, as previously worded, contradicted itself by seemingly including only the value of destroyed property to score points, when the variable also clearly stated it also addressed property "obtained."

The primary goal of judicial interpretation of statutes is to give effect to the intent of the Legislature. *People v Stephan*, 241 Mich App 482, 496; 616 NW2d 188 (2000). The trial court properly reconciled the inconsistencies in the statute and gave meaning to all words in the statute. See *People v Budnick*, 197 Mich App 21, 24; 494 NW2d 778 (1992); *Stephan, supra* at 497. We agree with the trial court that the intent of the Legislature was to have ten points scored in this circumstance.

Affirmed.