PEOPLE v LIBBETT

Docket No. 227619. Submitted April 9, 2002, at Grand Rapids. Decided
May 14, 2002, at 9:10 A.M.

Julius Libbett was convicted following a jury trial in the Kent Circuit
Court, Paul J. Sullivan, J, of carjacking and possession of a firearm
during the commission of a felony. Before trial, the defendant had
moved to quash the felony-firearm charge on the ground that insuf-
ficient evidence had been presented at the preliminary examination
to bind over the defendant on that charge. The court denied the
motion to quash. Following the trial, the defendant moved for a
new trial on the basis that the police had conducted an improper
on-the-scene identification. The court denied the motion for a new
trial. The defendant appealed.

The Court of Appeals held:

1. The evidence presented at trial that the defendant took the
complainant's automobile at gunpoint was sufficient to convict the
defendant of felony-firearm. Even if the magistrate erroneously
concluded that there was sufficient evidence produced at the pre-
liminary examination concerning the defendant's use of a weapon,
any error in binding over the defendant on the felony-firearm
charge was harmless because sufficient evidence to convict was
presented at trial.

2. Less than an hour and a half after the automobile in question
was taken, a police officer observed the stolen vehicle and gave
chase. When the automobile stopped, the defendant and a passen-
ger fled on foot, while two other passengers remained in the auto-
mobile and were apprehended. About twenty minutes later, with
the help of a canine unit, the defendant and the passenger were
apprehended. Within two hours of the carjacking, the complainant
was brought to the scene and identified both the defendant as the
person who had put a gun to the complainant's head and one of the
passengers who had been apprehended at the automobile as the
person who assaulted the complainant. Because the automobile
when it was stopped contained four individuals and because the
complainant had reported to the police that two individuals had
been involved in the taking of the automobile, the on-the-scene
identification was a reasonable way to determine which of the indi-

viduals who were in the automobile when it was stopped should be detained. The identification procedure was conducted with reasonable promptness, having been conducted within two hours of the crime and within twenty minutes of the suspects' having been apprehended. The trial court did not abuse its discretion in determining that the defendant was not entitled to a new trial on the basis of the on-the-scene identification.

3. By the time that the defendant was sentenced, the codefendant, who had pleaded guilty pursuant to a plea agreement, had already been sentenced. In sentencing the codefendant, the sentencing court had assessed offense variable 1 (OV 1), aggravated use of weapon, MCL 777.31, as five points and offense variable 3 (OV 3), MCL 777.33, as zero points. When the court sentenced the defendant, OV 1 was scored as fifteen points because a firearm had been pointed at the victim and OV 3 was scored as five points because there had been bodily injury not requiring medical treatment to the victim. Although the defendant does not assert the scoring was not supported by the evidence on the record, the defendant argues that the court was precluded from assessing scores greater than those assessed with respect to the codefendant because the statutory provisions regarding the respective offense variables provide that "[i]n multiple offender cases, if 1 offender is assessed points . . . , all offenders shall be assessed the same number of points." MCL 777.31(2)(b), 777.33(2)(a). It is clear that the Legislature intended that sentencing courts first accurately determine the highest number of points that should be scored for the offense variables and then should assess the same number of accurately scored points if there were multiple offenders in the same case. However, where, as here, it is clear that an offense variable has not been scored accurately with respect to the first-sentenced defendant, the statutory invocation that the scoring of the offense variables of multiple offenders be the same does not bind the second sentencing court to the erroneous score determined by the first sentencing court. Accordingly, the court in sentencing this defendant properly used the accurately assessed scoring rather than the inaccurate scoring used to sentence the codefendant.

Affirmed.

SENTENCING — STATUTORY OFFENSE VARIABLES — MULTIPLE OFFENDERS.

A sentencing court in assessing points for statutory offense variable 1 with respect to a subsequently sentenced offender in a multiple offender case is not required to assess the same number of points for that offense variable as were assessed with respect to a previously sentenced offender in the same case where it is clear that the scoring of the offense variable at the prior sentencing did not accu-

rately reflect the proper scoring for that offense variable (MCL 777.31[2][b]).

*Jennifer M. Granholm*, Attorney General, *Thomas L. Casey*, Solicitor General, *William A. Forsyth*, Prosecuting Attorney, *Timothy K. McMorrow*, Chief Appellate Attorney, and *T. Lynn Hopkins*, Assistant Prosecuting Attorney, for the people.

*William A. Van Eck*, for the defendant.

Before: OWENS, P.J., and MARKEY and MURRAY, JJ.

PER CURIAM. Following a jury trial, defendant was convicted of carjacking, MCL 750.529a, and possession of a firearm during the commission of a felony, MCL 750.227b. He was sentenced as a third-offense habitual offender, MCL 769.11, to ten to twenty-five years' imprisonment for the carjacking conviction and to a two-year consecutive prison term for the felony-firearm conviction. Defendant appeals as of right. We affirm.

### I. BASIC FACTS AND PROCEDURAL HISTORY

The facts adduced at trial revealed the following. On September 19, 2000, at approximately midnight, Ezequiel Deleon-Rodas (hereinafter Rodas) drove his uncle's blue Ford Tempo to a local party store. Rodas testified that while returning to the car, two black men, one taller than the other, stopped him. According to Rodas, the shorter man hit him, while the taller man put a gun to his head. The taller man ordered Rodas to unlock the car, which Rodas did, and the two men proceeded to get into the car and leave. Once the men left with the car, Rodas returned to the party store and asked the store attendant to call the

police. The police arrived approximately ten to fifteen minutes later. The officer who arrived on the scene spoke to Rodas with the assistance of a Spanish-speaking police officer. Rodas informed the officer that a tall black male and a short black male had assaulted him at gunpoint and had taken the blue Tempo. After taking the statement from Rodas, the officer on the scene sent this general description of the suspects and the specifics concerning the car over the police radio.

According to Jerome Libbett, defendant's cousin and accomplice in this case, after he and defendant left with the car, they drove around, made a couple of stops, and then picked up two other individuals, Eric Libbett and Kenneth Libbett, who were also defendant's cousins. According to Kenneth, defendant and Jerome picked them up between midnight and 12:30 A.M. in a blue Tempo.

At approximately 1:20 A.M., Grand Rapids police officer Joseph Sirad noticed a car fitting the description traveling down the road. Sirad followed the car, which proceeded to jump a median and end up in a McDonald's parking lot. According to Sirad, before the car came to a complete stop, defendant and Eric got out and ran. Sirad ordered the other two passengers, Jerome and Kenneth, to get out of the car and lie down on the ground.

A manhunt then ensued in order to locate defendant and Eric. With the assistance of a canine unit, defendant and Eric were located approximately twenty minutes later. Once all the suspects were apprehended, the police picked up Rodas to see if he could identify any of the four individuals as the persons who assaulted him and stole his Tempo. At the

first scene, Rodas identified defendant as the taller man who had put the gun to his head, while at the second scene Rodas identified Jerome as the shorter man who assaulted him.

After a jury trial, defendant was convicted of carjacking and felony-firearm.

## II. ANALYSIS

### A. THE MOTION TO QUASH

Defendant first argues that the trial court erred in denying his motion to quash the felony-firearm charge. "A circuit court's decision to grant or deny a motion to quash charges is reviewed de novo to determine if the district court abused its discretion in binding over a defendant for trial." *People v Jenkins*, 244 Mich App 1, 14; 624 NW2d 457 (2000). Generally, "[t]he standard for reviewing a decision for an abuse of discretion is narrow; the result must have been so violative of fact and logic that it evidences a perversity of will, a defiance of judgment, or an exercise of passion or bias." *People v Torres (On Remand)*, 222 Mich App 411, 415; 564 NW2d 149 (1997). However, a magistrate's erroneous conclusion that sufficient evidence was presented at the preliminary examination is rendered harmless by the presentation at trial of sufficient evidence to convict. *People v Meadows*, 175 Mich App 355, 359; 437 NW2d 405 (1989).

MCL 750.227b punishes a person for possessing a firearm during the commission of or the attempt to commit a felony. Although defendant, in his statement to the police, denied having a gun and participating in the carjacking, several of the witnesses, including Rodas and Jerome, testified that defendant took

Rodas' car at gunpoint. This testimony at trial was sufficient evidence to convict defendant of felony-firearm. See, e.g., *People v Davis*, 216 Mich App 47, 53-54; 549 NW2d 1 (1996). Accordingly, even if the magistrate erroneously concluded that there was sufficient evidence produced at the preliminary examination, that error was harmless.

### B. ON-THE-SCENE IDENTIFICATION

Defendant next argues that the trial court erred in denying his motion for a new trial because the police conducted an improper on-the-scene identification. A trial court's decision whether to grant a new trial is reviewed for an abuse of discretion. *People v Jones*, 236 Mich App 396, 404; 600 NW2d 652 (1999). As noted, an abuse of discretion exists only if the result was so violative of fact and logic that it indicates either a perversity of will, a defiance of judgment, or an exercise of passion or bias. *Torres, supra* at 415.

Defendant challenges the on-the-scene identification, arguing that it was not prompt and that it was inherently suggestive. Defendant further argues that the on-the-scene identification procedure used was improper because the police already possessed sufficient information to supply probable cause to arrest defendant and there were no exigent circumstances.[1]

We initially point out that this argument does not implicate any right to counsel under the Sixth Amend-

---

[1] We note that defendant spends a considerable amount of time arguing that this case is similar to *People v Miller*, 208 Mich App 495; 528 NW2d 819 (1995). However, because our Supreme Court has stated that *Miller* has no precedential value, *People v Miller*, 450 Mich 955 (1995), defendant's reliance on that case is misplaced.

ment of the United Stated Constitution.[2] Rather, defendant's argument implicates the right to counsel as declared by our Supreme Court in *People v Anderson*, 389 Mich 155; 205 NW2d 461 (1973). *People v Winters*, 225 Mich App 718, 721-722; 571 NW2d 764 (1997). In *Winters*, this Court held that prompt, on-the-scene identifications are reasonable, "indeed indispensable, police practices because they permit the police to immediately decide whether there is a reasonable likelihood that the suspect is connected with the crime, and subject to arrest, or merely an unfortunate victim of circumstance." *Id.* at 728. How the *Winters* Court came to this holding is critical to an understanding of this area of law and to a resolution of the issue in this case.

In *Winters*, this Court noted that in *Anderson, supra*, the Supreme Court, in dicta, recognized that the absence of counsel at an eyewitness identification procedure may be justified where there is a prompt, on-the-scene corporeal identification within minutes of the crime. *Id.* at 726. The *Winters* Court noted that on the basis of *Anderson*, this Court had previously adopted three varying approaches in analyzing whether a defendant is entitled to counsel during a prompt, on-the-scene identification. *Id.* The *Winters* Court noted that one panel of this Court had adopted the approach that "when the police have 'more than a mere suspicion' that the suspect is wanted for the

---

[2] The United States Supreme Court has repeatedly pronounced that the Sixth Amendment right to counsel " 'does not attach until a prosecution is commenced, that is, at or after the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.' " *Texas v Cobb*, 532 US 162, 167-168; 121 S Ct 1335, 1340; 149 L Ed 2d 321 (2001), quoting *McNeil v Wisconsin*, 501 US 171, 175; 111 S Ct 2204; 115 L Ed 2d 158 (1991).

crime, the officer cannot return the suspect to the scene of the crime but must take him to the police station and have a lineup at which counsel is present." *Id.*, quoting *People v Dixon*, 85 Mich App 271, 280-281; 271 NW2d 196 (1978).

The *Winters* Court then noted that a second panel of the Court had adopted the approach that "police officers may conduct an on-the-scene identification without the presence of counsel any time promptly after the crime, except where the police have 'very strong evidence' that the person stopped is the culprit." *Winters, supra* at 726-727, quoting *People v Turner*, 120 Mich App 23, 37; 328 NW2d 5 (1982). The Court in *Winters, supra* at 727, quoted the holding in *Turner, supra* at 37 that " '[s]trong evidence exists where the suspect has himself decreased any exculpatory motive, i.e., where he has confessed or presented the police with either highly distinctive evidence of the crime or a highly distinctive personal appearance.' " The *Winters* Court finally noted that a third panel of the Court had noted that the second approach, the one taken in *Turner*, may not always be an easy one to apply and had interpreted "very strong evidence" to mean " 'evidence such that the police, acting in good faith, have no reasonable necessity for confirming that the suspect they have apprehended is in fact the perpetrator.' " *Winters, supra* at 727, quoting *People v Wilki*, 132 Mich App 140, 144; 347 NW2d 735 (1984).

The *Winters* Court stated that the first two approaches "fail[ed] to provide a simple, practical standard consistent with *Anderson* for use by police officers in the field." *Winters, supra* at 727. Therefore, as previously noted, the *Winters* Court held

"that it is proper and does not offend the *Anderson* requirements for the police to promptly conduct an on-the-scene identification" because "[s]uch on-the-scene confrontations are reasonable, indeed indispensable, police practices because they permit the police to immediately decide whether there is a reasonable likelihood that the suspect is connected with the crime and subject to arrest, or merely an unfortunate victim of circumstance." *Id.* at 727-728. The *Winters* Court also reasoned that the confrontations promote fairness by assuring greater reliability. *Id.* at 728.

In the instant case, trial testimony established that the car was stolen at approximately midnight and Rodas was taken to identify the suspects at 1:54 A.M. In that time, defendant and Jerome picked up their cousins and then drove around in the stolen car for approximately an hour before they were spotted by an officer who heard a description of the car over the police radio. A car chase ensued, following which defendant and Eric fled on foot. Defendant and Eric were apprehended approximately twenty minutes later. Therefore, the on-the-scene identification occurred one hour and fifty-four minutes after the car was stolen, but only approximately twenty minutes after defendant and Eric were apprehended. While the above cases do not address this specific time frame,[3] the identification within that time frame permitted the police to immediately decide whether

---

[3] We note that had defendant and Eric not fled from and eluded the police, the period between the crime and the on-the-scene identification would have been shorter. Allowing suspects to avoid on-the-scene identifications by fleeing the police and prolonging the time that it takes the police to conduct the on-the-scene identification is not a proposition with which we agree.

there was a reasonable likelihood that the suspects who had been in the car were connected with the crime and subject to arrest, or merely unfortunate victims of circumstance. Indeed, at the time the Tempo was spotted by the police there were four occupants, while the information from Rodas had identified only two perpetrators. When presented with four black males with no greater description than one was taller than the other, it was reasonable for the police to have Rodas attempt to identify whether any of the four individuals were actually the perpetrators. Therefore, the on-the-scene identification was conducted as promptly as was reasonable under the circumstances and did not violate defendant's rights.

Defendant's argument that too much time had elapsed between the crime and the identification, because courts have upheld such identifications only when they took place "within minutes" of the crime, cannot pass muster. As noted previously, one of the main benefits of prompt on-the-scene identifications is to obtain reliability in the apprehension of suspects, which insures both that the police have the actual perpetrator and that any improvidently detained individual can be immediately released. See *Winters, id.* at 728. Here, because Rodas stated that only two males had been involved in the crime, police were confronted with the possibility that two of the four individuals apprehended from the car were not involved in the carjacking. Moreover, because Rodas had earlier seen the perpetrators who had committed the crime just two hours earlier, their appearance was still fresh in his mind. Hence, bringing Rodas to the two locations where the individuals were being detained accomplished the dual purposes behind

holding a prompt on-the-scene identification. The passage of almost two hours is simply not an unreasonable amount of time between the crime and the identification.[4] We therefore conclude that the holding of an on-the-scene identification almost two hours after the crime was committed, particularly where the identification took place only twenty minutes after police apprehended the suspects, was not unreasonable under the facts presented in this case.

Additionally, there was nothing in the record to suggest that the police made any suggestive comments at the identification or that the police were acting for reasons other than to determine "whether there [was] a reasonable likelihood that the suspect [was] connected with the crime and subject to arrest, or merely an unfortunate victim of circumstances." *Winters, id.* at 728. Accordingly, the trial court did not abuse its discretion in holding that defendant was not entitled to a new trial.

### C. THE SENTENCING GUIDELINES

Defendant's final argument is that the trial court erred in scoring his offense variables under the sentencing guidelines. This Court is required to affirm sentences falling within the guidelines range "absent an error in scoring the sentencing guidelines or inaccurate information relied on in determining the defen-

---

[4] Additionally, several courts from our sister states, applying the same or similar rule as contained in *Winters*, have held that a one- to two-hour lapse of time was not unreasonable as a matter of law especially where, as here, the suspects fled the police. See, e.g., *People v Cowger*, 202 Cal App 3d 1066, 1071-1073; 249 Cal Rptr 240 (1988); *Freeman v State*, 253 Ga App 597, 598-599; 560 SE2d 77 (2002); *Commonwealth v Drane*, 47 Mass App 913; 712 NE2d 1162 (1999).

dant's sentence." *People v Leversee,* 243 Mich App 337, 348; 622 NW2d 325 (2000); MCL 769.34(10).[5]

Defendant challenges the trial court's scoring of offense variable 1 (OV 1) and offense variable 3 (OV 3). Under the statutory sentencing guidelines, the relevant part of OV 1 for "aggravated use of a weapon" states:

> In multiple offender cases, if 1 offender is assessed points for the presence or use of a weapon, all offenders shall be assessed the same number of points. [MCL 777.31(2)(b).]

The relevant part of OV 3 for "physical injury to a victim" states:

> In multiple offender cases, if 1 offender is assessed points for death or physical injury, all offenders shall be assessed the same number of points. [MCL 777.33(2)(a).]

The trial court assessed defendant fifteen points for OV 1 and five points for OV 3. Defendant argues that according to the quoted statutory guidelines, because the other offender (Jerome) was previously assessed five points for OV 1 and zero points for OV 3, he should have also been assessed "the same number of points."[6]

---

[5] The Supreme Court's sentencing guidelines were superseded by the statutory sentencing guidelines mandated by MCL 777.1 *et seq.* The statutory guidelines apply to offenses committed on or after January 1, 1999. MCL 769.34(2); *People v Greaux,* 461 Mich 339, 342, n 5; 604 NW2d 327 (2000). Because defendant's crimes were committed on September 19, 1999, the statutory sentencing guidelines apply.

[6] However, defendant's argument on this issue is not pertinent to the OV 3 scoring, because it is undisputed that Jerome was not assessed any points under OV 3. Hence, only the trial court's scoring of OV 1 is at issue.

Under the instructions for OV 1, fifteen points are to be scored when "[a] firearm was pointed at or toward a victim," MCL 777.31(1)(b), and five points are to be scored when "[a] weapon was displayed or implied," MCL 777.31(1)(d). Importantly, we note that defendant is not arguing that the factual basis for his score is lacking. That is, he does not assert that fifteen points is an incorrect score because a weapon was only displayed or implied rather than pointed at the victim.[7] Rather, defendant's argument is based solely on the language of the guidelines instructions that, according to defendant, requires that all offenders in a multiple offender situation receive the same score for OV 1 regardless of whether the initial scoring was indisputably incorrect.

The sentencing issue raised by defendant requires us to apply the statutory sentencing guidelines, which is a legal question reviewed by this Court de novo. *People v Webb*, 458 Mich 265, 274; 580 NW2d 884 (1998). In *People v Morey*, 461 Mich 325, 329-330; 603 NW2d 250 (1999), the Supreme Court set forth well-established principles of statutory construction that are applicable in resolving the current dispute:

> In [construing statutes], our purpose is to discern and give effect to the Legislature's intent. We begin by examining the plain language of the statute; where that language is unambiguous, we presume that the Legislature intended the meaning clearly expressed—no further judicial construction is required or permitted, and the statute must be enforced as written. We must give the words of a statute their plain and ordinary meaning, and only where the statutory lan-

---

[7] This is likely so because the evidence produced at trial revealed that defendant put the gun to Rodas' head when demanding the car from him.

guage is ambiguous may we look outside the statute to ascertain the Legislature's intent. [Citations omitted.]

The *Morey* Court, *id.* at 330, further instructed that, in determining the plain meaning of statutory language,

"[t]he fair and natural import of the terms employed, in view of the subject matter of the law, is what should govern," *People ex rel Twitchell v Blodgett*, 13 Mich 127, 168 (1865) (COOLEY, J.), and as far as possible, effect must be given to every word, phrase, and clause in the statute.

In the present case, defendant argues that under MCL 777.31(2)(b), the trial court was required to use as his score for OV 1 the same five points that Jerome had received for OV 1 in his sentencing after entry of his guilty plea, even though it is undisputed that the proper score for OV 1 in this case was the fifteen points the trial court actually scored defendant. Although defendant would be correct if we were to read subsection 2(b) in isolation, we are not permitted to read the statute in that manner. Rather, this Court is required to construe a statute in light of the other statutory provisions in order to carry out the intent of the Legislature. *Morey, supra* at 329-330; *In re Messer Trust*, 457 Mich 371, 380; 579 NW2d 73 (1998). " '[I]n seeking meaning, words and clauses will not be divorced from those which proceed and those which follow,' " *Herald Co v Bay City*, 463 Mich 111, 130, n 10; 614 NW2d 873 (2000), quoting *Sanchick v State Bd of Optometry*, 342 Mich 555, 559; 70 NW2d 757 (1955), because we must "afford the statute an interpretation that achieves harmony between and among specific provisions to provide a reasonable meaning," *Messenger v Dep't of Consumer*

& *Industry Services*, 238 Mich App 524, 533; 606 NW2d 38 (1999).

When reading MCL 777.31 in its entirety, it is clear that the Legislature intended for the sentencing courts to first accurately determine the highest number of points that are to be scored under MCL 777.31(1)(a)-(e) and then to assess the same number of accurately scored points to multiple offenders in the same case under MCL 777.31(2)(b). If we were to read subsection 2(b) in isolation, as defendant suggests, then we would not be giving effect to subsection 1, which requires that the court first accurately score the offense variable by assigning the defendant the highest number of attributable points that apply.[8] In this case, however, it is undisputed that the five points initially assessed to Jerome were scored incorrectly because both parties and the trial court recognized that the proper score under MCL 777.31(1) and the facts of this case would be fifteen points. Accordingly, we hold that Jerome's erroneous score for OV 1 did not statutorily bind the trial court under MCL 777.31(2)(b) to assess the same erroneous score for defendant in this case.

Affirmed.

---

[8] We point out the procedural posture of this case. When the trial court scored defendant under MCL 777.31, Jerome had already pleaded guilty pursuant to a plea agreement. Hence, this initial scoring with respect to Jerome was not based on the facts adduced at trial, as was defendant's scoring.