*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* K. D. MITCHELL, Minor.

UNPUBLISHED
March 17, 2022

Nos. 358193; 358194
Arenac Circuit Court
Family Division
LC No. 21-014740-NA

Before: GLEICHER, C.J., and SERVITTO and LETICA, JJ.

PER CURIAM.

In these consolidated appeals,[1] respondent-mother (mother) and respondent-father (father) appeal as of right the trial court's order removing their minor child, KM, from their custody. We vacate the portion of the trial court's order after the preliminary hearing that removed the child and remand for further proceedings.

## I. BASIC FACTS AND PROCEDURAL HISTORY

On July 9, 2021, petitioner, the Department of Health and Human Services (DHHS), requested that the trial court take jurisdiction over KM (d/o/b 01/29/20), alleging that it received a Children's Protective Services (CPS) complaint from father's sister raising a number of concerns with respondents' care of KM. On July 7, 2021, father's sister reported that KM was found crying in a soiled diaper with soiled clothing and wet bedding on July 4, and mother could not be awakened. About an hour later, mother still could not be roused, and once she finally was, she appeared to be under the influence. Asked where father was, she said he was probably buying drugs.[2] Mother told DHHS that she had taken a prescribed sleep medication, but could not provide the prescription.

---

[1] *In re Mitchell*, unpublished order of the Court of Appeals, entered September 7, 2021 (Docket Nos. 358193; 358194).

[2] When later asked, father said he was at work.

The petition also alleged that respondents engaged in numerous incidents of domestic violence that were not reported to the police and occurred in KM's presence. Father's sister stated that KM had blood on her clothing from an incident that occurred around Christmas 2020.

Moreover, in June 2021, respondents had spent a day at the river while relatives cared for KM. Respondents each attempted to retrieve KM, but relatives refused to let them take her because they appeared to be under the influence. Mother was subsequently in a rollover car accident and arrested for operating while intoxicated. Her blood alcohol level was .128.

Respondents also had lengthy CPS histories. Mother first came to CPS's attention in 2011. Twenty-two investigations followed with substantiations for physical neglect, threatened harm, and maltreatment related to substance abuse and domestic violence. Father's CPS history dated back to 2014 and eight investigations followed.

The trial court previously terminated mother's parental rights to four of her five other children, including two that she shared with father, whose rights were also terminated. As to mother's fifth child, he was in his father's custody. To visit him, mother was required to submit to a drug screen; she had not visited since March 2021. In that same month, mother stopped reporting to her probation officer. Mother's failure to appear for a narcotic equipment possession violation hearing also resulted in an arrest warrant being issued.

The day before the petition was filed, DHHS asked respondents to provide a drug screen. They refused. DHHS then filed the petition, asking the court to order in-home jurisdiction over KM, alleging that respondents' substance abuse and domestic violence negatively impacted their ability to properly care for KM.[3]

Six days later, the trial court held an initial preliminary hearing. Respondents requested appointed counsel. DHHS acknowledged that it was not seeking KM's removal at that time, but it sought drug testing of respondents. Mother volunteered to submit to drug testing, which the court ordered before adjourning the hearing to July 29, 2021.

Two days before the rescheduled hearing date, DHHS filed an amended petition, seeking to remove KM from respondents' custody. It alleged that mother tested positive for tetrahydrocannabinol (THC) and father tested positive for methamphetamine and THC on July 15, 2021. Two days later, respondents again tested positive for THC. On July 27, 2021, mother refused to complete a drug screen, informing DHHS that she would only submit to testing when father was present later that day. These considerations were added to the reasons why it was contrary to KM's welfare to remain in respondents' home.

At the continued preliminary hearing on July 29, 2021, the CPS worker reiterated many of the allegations contained in the amended petition. She added that respondents voluntarily

---

[3] Despite DHHS's request for in-home care, the petition detailed reasons why it was contrary to KM's welfare to remain in respondents' home and further listed ten separate services provided to prevent KM's removal.

relinquished their parental rights to the two children they shared and updated the court, reporting that mother had addressed her outstanding arrest warrant.

Although father attempted to explain his initial drug screen was partially a false positive owing to a prescription medication, the testing facility rejected this hypothesis. And, as to mother's refusal to drug screen on July 27, she asked if she could wait until father was present. Because DHHS had other clients scheduled, it could not accommodate her request.

The worker recognized that recreational marijuana use is legal in this state, MCL 333.27951 *et seq.*,[4] and explained that it was "difficult to determine when individuals are under the influence of THC." Mother reported using marijuana to deal with her medical issues, but she did not have a MMMA card. Notably, mother also reported she was struggling to maintain her recovery and was under a lot of stress.

Regarding the domestic violence allegations, the CPS worker did not know how often father's sister, who lived in Pinconning, was in contact with respondents. To follow up on this allegation, the worker contacted father's aunt to inquire. Father's aunt, who was respondents' landlord and lived around the corner from them, reported no domestic violence. The CPS worker further recognized that no police reports or physical evidence supported the domestic-violence allegation.

After filing the petition, the worker visited respondents' home three times. She saw evidence of properly-secured marijuana and paraphernalia, but no evidence of methamphetamine. She observed nothing that presented a risk of harm to KM. And she opined that weekly court-ordered drug testing would be a service that could adequately safeguard KM in the home as long as respondents refrained from drug use and their screens "remained negative for substances."

The Families First worker also testified. After the petition was filed, she worked with respondents in their home for three weeks, visiting approximately ten hours spread over four days. She did not observe any conduct that presented a substantial risk of harm to KM and did not witness any concerning arguments between respondents. The worker was addressing respondents' substance-abuse issues, healthy relationships, and basic parenting skills. She opined that respondents were participating in and benefitting from the services she provided. The worker's services were scheduled to end in a week, but could be extended for two additional weeks.

---

[4] The statute specifically provides that "[a] person shall not be denied custody of or visitation with a minor for conduct that is permitted by this act, unless the person's behavior is such that it creates an unreasonable danger to the minor that can be clearly articulated and substantiated." MCL 333.27955(3). The Michigan Medical Marijuana Act (MMMA) contains a similarly-worded provision. See MCL 333.26424(d) ("A person shall not be denied custody or visitation of a minor for acting in accordance with this act, unless the person's behavior is such that it creates an unreasonable danger to the minor that can be clearly articulated and substantiated."). This Court has analyzed the like MMMA provision in *In re Richardson*, 329 Mich App 232; 961 NW2d 499 (2019). See also OAG, 2013, No. 7271, p 1 (May 10, 2013).

Father's initial drug screen, provided on July 15, and after Families First was involved, was positive for methamphetamine, amphetamines, and marijuana. The CPS worker described father earlier that day as being "a little more high strung," but then said his behavior was "not too concerning." The worker also testified that while respondents were in court, KM was not present and under the care of another person.

Despite the positive testimony from the CPS and the Families First workers, DHHS requested removal because it was concerned about respondents' substance-abuse history and their unreported domestic violence due to their fear of KM being removed. In DHHS's view, it appeared that respondents were relapsing. DHHS was concerned about methamphetamine, amphetamines, and marijuana. Especially worrying was the July incident, where mother slept through KM's cries, leaving KM so hungry that she ate for an hour before she was satisfied.

After the testimony ended, respondents' attorneys opposed authorization of the petition as well as removal. They contended that without the allegations of father's sister, there was "nothing there," because KM was not with respondents during the drunk-driving incident. They further argued that there was a lack of physical injuries to support the domestic-violence allegations and that consideration of the prior terminations did not recognize that "people have a right to change." Mother's attorney apologized for her refusal to drug screening, explaining that there had been issues previously and she wanted to have a witness.

KM's guardian ad litem advocated for authorization, but was less certain that removal was required given the Family First worker's testimony. Even so, father's positive drug screen for methamphetamine was concerning.

The trial court then determined that there was probable cause to authorize the petition against respondents. The court also found that KM remaining in respondents' home presented a serious risk of harm to her and that reasonable efforts had been made to avoid removal. In reaching its decision, the trial court stated:

> I do find there's probable cause to authorize the petition; I think there's an abundance of evidence. This Court is familiar with this family, this family has a history, a long and substantial history of serious drug abuse, of domestic violence, of child neglect. In fact, so serious . . . that cases were commenced with efforts made to correct the issues with prior children, that were abundantly unsuccessful, so unsuccessful that there were releases of parental rights. Those concerns, I agree with [mother's counsel's] comment that sometimes people change, I disagree that they've changed in this case, or they appear to have changed.
>
> There is good reason for [DHHS] to have checked on this latest child, [KM], who apparently was dirty, unkempt, with soiled diaper, which doesn't sound like that's uncommon.
>
> Both of the parents have, well, first of all are admitting to using some drugs, and have tested positive for marijuana, both have tested positive for marijuana, which is a controlled substance whether or not it's legal in Michigan or not, it's unhealthy for substance abusers to be using marijuana, and it creates an issue with

-4-

any children, or anyone who's under their care. Moreover, there's evidence of positive tests for [methamphetamines] as well as amphetamines with respect to [father].

There is evidence, I mean this is a probable cause hearing, and I heard evidence of incidents, continued incidents regarding domestic violence and the child being neglected.

This isn't even remotely a close call from today's hearing. It's a very, very serious problem that needs to be addressed seriously. My largest concern, quite frankly, is I don't think that either, and it's not inconsistent with my observations of the respondents at [the] last hearing. I don't think either parent has any sense of ownership, or maybe it's not even a realization as to how serious these problems are and continue to be, they don't take any ownership. When I have someone who takes ownership at least, at least there's the belief that we can go forward and correct the barriers that are in front of us. In fact with most cases we have successful results. When we don't have parents who even recognize, or acknowledge, the issues that are clearly and conspicuously, in this case so obviously in front of them, it leaves the Court with a very serious concern that it will ever be corrected, particularly when we have such an example of habituality, as we do in this case.

So not only do I, am I going to authorize the petition, I am going to, I do find that there is a serious risk of harm to the children [sic] and best interest of, it's in the best interest of the children [sic] to remove, to be removed from their [sic] parent's [sic] care.

I do find that reasonable efforts have been made. There's been a number of efforts with respect to this family over the history that I'm familiar with. I'll adopt those efforts that have been referenced by [the CPS worker], both on the petition and supplemental petition,[5] as well as on the record,[6] and I'm going to incorporate those by reference.

[] I'm placing the children [sic] with the Department. I'm going to authorize parenting time subject to each of the parents passing two consecutive drug screens

---

[5] The services listed were: CPS case management, foster care case management, public health nurse services, random drug screens, state medical and food assistance, Ten16 substance abuse services, Bay Area Women's Center domestic violence services, Families First, Sterling Area Health Center, and Women, Infants and Children. Given the court's prefatory remarks, it appears that "a number of" these efforts may have been related to respondents' prior matter.

[6] The caseworker testified the services provided in this case were Families First and drug screens. DHHS also encouraged mother to participate in counseling. Moreover, the caseworker understood that respondents benefitted from financial or food assistance as well. Again, with the trial court's prefatory remarks, it is unclear whether some of the services listed by the DHHS and the court were actually provided to respondents in their prior matter.

that are clean of controlled substances. Then the parenting time will be supervised at the discretion of the [DHHS].

DHHS's attorney asked whether the requirement that respondents remain free from controlled substances included THC. The court responded, "It does."

The trial court subsequently entered an order that concluded one or more the allegations in the petition were true and that it was necessary to remove KM from respondents' custody. In pertinent part, the court's form order read:

> Custody of the child[] with the parent[] . . . presents a substantial risk of harm to the child[]'s life, physical health, or mental well-being . . . . No provision of service or other arrangement except removal of the child[] is reasonably available to adequately safeguard the child[] from the risk of harm to the child[]'s life, physical health, or mental well-being . . . . Conditions of custody at the placement away from the home and with the individual with whom the child[] is placed []are adequate to safeguard the child[]'s health and welfare.[7]

The court's order also summarized the reasons why KM remaining in respondents' home was contrary to her welfare:

> [Respondents] have a significant history of domestic violence, substance abuse, criminal history, prior removal and termination of parental rights to their other children. On July 15, 2021, [father] tested positive for methamphetamines. On July 27, 2021, [mother] refused to drug screen for the [DHHS], after agreeing to drug testing at the prior hearing. There have been numerous reports of domestic violence in the last 6 months and evidence of physical neglect of [KM] has been presented.

Respondents appeal, challenging only the portion of the court's order removing KM from their custody.

## II. THE REMOVAL DECISION

Respondents contend that the trial court failed to make all of the required factual findings necessary to order removal and that its decision to remove KM was clearly erroneous. We agree.

After conducting a preliminary investigation, DHHS may petition the family division of the circuit court to take jurisdiction over a child. *In re Ferranti*, 504 Mich 1, 15; 934 NW2d 610 (2019). The petition must contain "[t]he essential facts that, if proven, would allow the trial court

---

[7] The form order further provided: "the child[] is[] at substantial risk of harm or is[] in surroundings that present an imminent risk of harm and the child[]'s immediate removal from those surroundings is necessary to protect the child[]'s health and safety, . . . the circumstances warrant issuing this order[,] and . . . no remedy other than protective custody is reasonably available to protect the child[]."

to assume jurisdiction over the child." *Id*. (quotation marks and citation omitted); see also MCR 3.961(B)(3) and MCR 712A.2(b). After a trial court receives the petition and holds a preliminary hearing, it "may authorize the filing of the petition upon a finding of probable cause that one or more of the allegations are true and could support the trial court's exercise of jurisdiction under MCL 712A.2(b)." *Ferranti*, 504 Mich at 15.

If the petition is authorized, the trial court must decide "whether the child should remain in the home, be returned home, or be placed in foster care pending trial." *In re Benavides*, 334 Mich App 162, 167; 964 NW2d 108 (2020) (quotation marks and citation omitted). MCL 712A.13a(9) governs the court's removal decision, providing:

> The court may order placement of the child in foster care if the court finds all of the following conditions:
>
> (a) Custody of the child with the parent presents a substantial risk of harm to the child's life, physical health, or mental well-being.
>
> (b) No provision of service or other arrangement except removal of the child is reasonably available to adequately safeguard the child from the risk as described in subdivision (a).
>
> (c) Continuing the child's residence in the home is contrary to the child's welfare.[8]
>
> (d) Consistent with the circumstances, reasonable efforts were made to prevent or eliminate the need for removal of the child.[9]
>
> (e) Conditions of child custody away from the parent are adequate to safeguard the child's health and welfare.

MCR 3.965(C)(2) is identical in substance to MCL 712A.13a(9).

---

[8] "[T]he court must make a statement of findings, in writing or on the record, explicitly including the finding that it is contrary to the welfare of the child to remain at home and the reasons supporting that finding. If the 'contrary to the welfare of the child' finding is placed on the record and not in a written statement of findings, it must be capable of being transcribed." MCR 3.965(C)(3).

[9] "Reasonable efforts findings must be made. In making the reasonable efforts determination under this subrule, the child's health and safety must be of paramount concern to the court. When the court has placed a child with someone other than the custodial parent . . . , the court must determine whether reasonable efforts to prevent the removal of the child have been made or that reasonable efforts to prevent removal are not required. The court must make this determination at the earliest possible time, but no later than 60 days from the date of removal, and must state the factual basis for the determination in the court order." MCR 3.965(C)(4).

"MCR 3.965(C)(2) and MCL 712A.13a(9) explicitly require that the trial court find *all* the factors prior to removing a child from a parent's care." *In re Williams*, 333 Mich App 172, 184; 958 NW2d 629 (2020) (emphasis in original). The trial court is not required to articulate extensive findings addressing every conceivable detail. *Id*. at 183. Rather, when examining the factual findings in support of factors, they must be sufficient for the appellate court to conduct a meaningful review. *Id*.; see also *Woodington v Shokoohi*, 288 Mich App 352, 357; 792 NW2d 63 (2010).

The trial court's factual findings addressing the removal decision are reviewed for clear error. *In re Benavides*, 334 Mich App at 167. A finding is clearly erroneous if the reviewing court "is left with a definite and firm conviction that a mistake has been made." *Id*. (quotation marks and citation omitted). The preponderance of the evidence standard applies, *In re Williams*, 333 Mich App at 183, meaning that "the evidence must persuade the fact-finder that it is more likely than not that the proposition is true." *Miller-Davis Co v Ahrens Constr, Inc (On Remand)*, 296 Mich App 56, 71; 817 NW2d 609 (2012), rev'd in part on other grounds 495 Mich 161 (2014), citing M Civ JI 8.01. The rules of evidence do not apply, except those regarding privileges. MCR 3.965(C)(12). Finally, any error in the trial court's removal order is not grounds for reversal unless it would be inconsistent with substantial justice to permit it to stand. *In re Williams*, 333 Mich App at 185; *In re TC*, 251 Mich App 358, 371; 650 NW2d 698 (2002); see also MCR 3.902(A); MCR 2.613(A).

Here, the trial court made specific findings that: (1) custody with respondents presented a substantial risk of harm to KM's life, physical health, or mental well-being, (2) continuing KM's residence in respondents' home was contrary to KM's welfare, and (3) consistent with the circumstances, reasonable efforts were made to prevent or eliminate the need for KM's removal. See MCL 712A.13a(9)(a), (c), and (d). However, the trial court failed to make specific findings that "[n]o provision of service or other arrangement except removal of the child is reasonably available to adequately safeguard the child from risk," MCL 712A.13a(9)(b), or that "[c]onditions of child custody away from the parent are adequate to safeguard the child's health and welfare," MCL 712A.13a(9)(e).[10]

As to MCL 712A.13a(9)(b), the trial court did not consider whether anything short of removal could have kept KM safe. The trial court made no mention of alternative arrangements that could have protected KM from the risk presented by respondents' alleged substance abuse, domestic violence, and physical neglect. The trial court stated its belief that respondents lacked a "sense of ownership" over their habitual behavior, but it did not explain what factual basis supported this finding, nor did it articulate how removal was the only option reasonably available

---

[10] We recognize that the trial court checked these boxes in its removal order. See *In re KMN*, 309 Mich App 274, 287; 870 NW2d 75 (2015) (quotation marks and citation omitted) ("a court speaks through its written orders and judgments, not through its oral pronouncements"). However, this did not suffice to satisfy the trial court's obligation under MCL 712A.13a(9). While the court was "not obligated to articulate extensive findings regarding every conceivable detail," it had to "make a record of its findings as to each and every factor sufficient for this Court to conduct a meaningful review." See *Williams*, 333 Mich App at 183.

-8-

to keep KM safe. To the contrary, the CPS worker testified that if the respondents refrained from using controlled substances, complied with offered services, and maintained negative drug screens, KM could safely remain in their home.

As to MCL 712A.13a(9)(e), the trial court made no findings that the conditions of KM's placement would adequately safeguard her health and welfare. The trial court's only reference to the effect of removal on KM was a conclusory statement that removal was in her "best interest." Although the CPS worker testified that father's sister and other relatives were interested in placement, the trial court made no findings about a potential placement, beyond stating that KM would be placed with DHHS. Moreover, the court did not consider whether 18-month-old KM's removal "might be more emotionally traumatic to her than keeping her in respondent[s'] care." *Williams*, 333 Mich App at 184. Accordingly, the trial court failed to make required findings under MCL 712A.13a(9)(e).

We also have some doubts regarding the trial court's conclusion that continued custody of KM with respondents presented a substantial risk of harm to her. We recognize that the trial court placed great weight on the prior voluntary termination arising from what was described as long-term substance abuse, domestic violence, and neglect. But without additional information, we cannot evaluate the probative value of the "inference that a parent's treatment of one child is probative of how that parent may treat other children." See *In re Kellogg*, 331 Mich App 249, 259-261; 952 NW2d 544 (2020). Even assuming that the situations were comparable, the petition suggests the prior proceeding took place sometime after 2014. KM was born in early 2020, and respondents had been caring for her for over seventeen months before father's sister raised any concern. The incident that brought respondents to DHHS's attention again was certainly disturbing, but there was no evidence supporting the trial court's suggestion that this was a common event. And the CPS worker testified she was satisfied that KM was safe in respondents' home so long as they complied with offered services, abstained from drug use, and maintained negative drug screens.[11]

Nor is there evidence that the level of substances detected through respondents' screens impaired their ability to care for KM. The CPS worker testified that on the day of father's initial positive screen, father only appeared slightly "more high strung;" otherwise, his behavior was "not too concerning." And, despite the CPS worker's difficulty in discerning whether someone was under the influence of marijuana, she testified that respondents did not appear under the influence during her repeated visits. In fact, DHHS did not even request removal upon receipt of respondents' positive results.[12] Instead, it was apparently mother's refusal to screen that prompted

---

[11] Mother contends that her agreement to undergo drug testing at the July 15, 2021 preliminary hearing was involuntary, and therefore her subsequent refusal to test should not be used against her. However, the court had the authority to enter a temporary order for KM's protection pending the appearance of mother's attorney or the completion of the preliminary hearing. See MCR 3.965(B)(3).

[12] The Child Protective Services manual recognizes:

DHHS to request KM's removal from both respondents. Again, both workers testified that there was no risk of harm to KM in respondents' home. The CPS worker opined that there were alternatives to adequately safeguard KM and the Families First worker testified that respondents were receptive to and benefitting from services put in place to address their substance abuse, relationship, and parenting skills. Accordingly, the record before us does not support the trial court's conclusion by a preponderance of the evidence that respondents' marijuana use put KM at substantial risk, let alone that their "behavior [was] such that it create[d] an unreasonable danger to [KM] that can be clearly articulated and substantiated." MCL 333.27955(3).

This leaves the allegation pertaining to domestic violence. Father's sister reported multiple instances over six months, but only described one event that occurred in December 2020. Father's aunt, who lived nearby, reported there was no domestic violence. The CPS worker recognized that there were no police reports or physical injuries supporting this allegation. Even so, DHHS put Families First services in place to address healthy relationships. The Families First worker witnessed no concerning arguments between respondents and testified that respondents were accepting and receiving benefit from the services provided.

Finally, we question whether the trial court appropriately credited DHHS with reasonable efforts that were offered in the prior voluntary termination matter in this case. The statute authorizes the trial court to order placement of the child in foster care if it finds, "[c]onsistent with the circumstances, reasonable efforts were made to prevent or eliminate the need for removal of the child." MCL 712A.13a(9)(d). The plain statutory language requires DHHS's efforts to be made as to the particular child at risk of abuse and neglect.

For these reasons, the trial court clearly erred in removing KM from respondents' home and its order was inconsistent with substantial justice.

Vacated in part and remanded for further proceedings. We do not retain jurisdiction.

/s/ Elizabeth L. Gleicher
/s/ Deborah A. Servitto
/s/ Anica Letica

---

A complaint involving only substance use is insufficient for investigation or confirmation of child abuse or neglect. Parents may use legally or illegally obtained substances and prescribed medications to varying degrees and remain able to safely care for their children.

Substance abuse by a parent/caregiver may be a risk factor for child maltreatment. For cases involving known substance abuse caseworkers must evaluate its impact on child safety. Substance abuse is a mental health disorder and caseworkers should assist the parent/caregiver in accessing relevant supports and services. [PSM 716-7, Children's Protective Services Manual, September 1, 2020, p 1.]

-10-