*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

WALTER MALIK WHITNER,

        Defendant-Appellant.

UNPUBLISHED
March 19, 2026
10:37 AM

No. 371635
Wayne Circuit Court
LC No. 19-008708-02-FC

Before: RIORDAN, P.J., and O'BRIEN and YOUNG, JJ.

PER CURIAM.

Defendant Walter Malik Whitner appeals as of right his conviction and sentence for conspiracy to commit armed robbery, MCL 750.157a and MCL 750.529, for which he was sentenced to 10 to 25 years in prison. On appeal, defendant argues that the evidence was insufficient to sustain his conviction, that the trial court incorrectly scored OVs 1 and 3, MCL 777.31 and MCL 777.33, and that the trial court erred by allowing the prosecution to add an additional witness during trial. In addition, in a Standard 4 brief, defendant argues that the trial court erred by allowing the prosecution to present the video recording of his arrest, that the prosecution violated his due-process rights by withholding exculpatory evidence and presenting perjured testimony, that he received the ineffective assistance of trial counsel, and that the trial court erred by imposing its 10-year minimum sentence.[1] Finding no errors warranting relief, we affirm.

## I. FACTS

This case concerns an alleged conspiracy involving defendant, Samuel Johnson, George Robinson (a/k/a "Emo"), Gwendolyn Christian, and others to rob Willie Pittman, a known dealer of pills. Pittman was shot during the robbery and died at the hospital several hours later, thus

---

[1] Defendant also argues in his Standard 4 brief that appellate counsel was ineffective for failure to raise the issues therein. However, we consider the merits of the Standard 4 issues in the same manner as the issues raised by appellate counsel.

leading the prosecution to file several charges against those individuals. The defendant before us was charged with conspiracy to commit armed robbery; armed robbery, MCL 750.529; felony murder with a predicate felony of larceny, MCL 750.316(1)(b); and second-degree murder, MCL 750.317. The prosecution's theory of the case was that defendant initiated the conspiracy with Christian and, although he was not present at the armed robbery itself, was nonetheless guilty of the remaining charged offenses as an aider and abettor. The jury ultimately found him guilty of the conspiracy charge and not guilty of the remaining three charges. For the purposes of this appeal, the relevant facts are as follows.

Detroit Police Corporal Raymond Diaz testified that in the early morning hours of February 7, 2019, he was dispatched to Kendall and La Salle Street in Detroit to investigate a shooting. At the scene, he observed a 2015 silver van with "several suspected bullet impacts. Near and around that vehicle are US currency, a firearm, suspected blood, and fired shell casings." In addition, Corporal Diaz or another officer observed "a clear plastic bag containing pills, 70 white pills and, I believe, one yellow pill" near the driver's seat of the van. Other narcotics were recovered from inside the van as well.

Detroit Police Officer Steffon Whitaker testified that on September 4, 2019, he was directed to arrest a suspect, defendant, who was sitting on a curb on Kelly Street. The prosecution then presented to the jury the video of his arrest and search as Exhibit 129. In that video, the police recovered pills in a pill bottle from his person. As explained by fellow arresting Officer John Siejutt, defendant told the police that the pills were his aunt's, notwithstanding that the pills were in his pocket and the label on the pill bottle "was ripped off the top," which prevented identification of the medical patient's name. The pills subsequently were determined to be "a controlled substance, hydrocodone pills."[2]

Darcell Danner testified that she and her brother, Darnell Danner, have cooperated with the prosecution in its various cases against defendant and others. Darcell explained that in early February 2019, the police raided her house and seized several weapons, including an AK-47, in connection with the Pittman homicide. Shortly before the raid, she overheard a conversation in her house about robbing Pittman:

> I was in the living room. Gwendolyn [Christian] came over talking to my little cousin Brian, Little Brian. And she was saying that she needed a gun. She said it was gonna be money and pills. She wanted the pills and they could keep the money. She wanted Brian to, like, act like when he was going to rob Mr. Pittman like he was robbing her too so she wouldn't be involved in it.

---

[2] Whether to admit the arrest video and accompanying police testimony was the subject of a pre-trial hearing. The trial court decided to admit that evidence under MRE 404(b), reasoning that it was admissible because "[t]he fact that the defendant was arrested on September 5, 2019 in possession of the same type of pills that the defendant admitted to taking from the deceased after his death is highly relevant to defendant's motive and intent."

Darcell added that her brother Darnell became involved because Darnell supplied a gun to Brian or Christian for the robbery. During his brief testimony, Darnell acknowledged that he provided a gun to Brian to be used in the robbery.

Tracie Herron testified that she was friends with Pittman. Herron explained that she had observed Pittman and defendant engage in the buying and selling of pills in the past. On February 6 and 7, around the time of Pittman's shooting, Herron received several phone calls from defendant. In those calls, defendant told Herron that Pittman had been "shot and robbed," and that "some boy brought the pill bag back to whatever house." Herron added that on multiple earlier occasions, Pittman told her that "he didn't trust" defendant and, on one occasion, "Mr. Pittman just said there's just something about him that – that doesn't sit right with me." Apparently, the reason for Pittman's particular comment was the manner in which defendant "look[ed]" at him during a certain transaction in which Pittman displayed a substantial amount of money. According to Herron, Pittman said that "[h]e was going to stop dealing with him because he didn't know what he would do to him."

David Moore testified that he pleaded guilty to second-degree murder, armed robbery, and felony-firearm in connection with the Pittman homicide, agreeing to provide truthful testimony against others involved in the matter. Moore explained that in early February 2019, Christian "approached me and said she had a lick for me." In particular, Christian told Moore, who was in Robinson's presence at the time, that Pittman had "$10,000 on the front seat" and "a bunch of pills." Moore replied that he would "think about it." The following day, Moore and Robinson "rode around and see were any cameras that led up to – in case of getting caught or anything." Robinson suggested doing the robbery at or near "Poochie's house" because, essentially, "she dumb" and would be unaware of the overall situation.[3]

According to Moore, on the night in question, Robinson "drop[ped] Gwen off at Poochie's," and shortly thereafter, "Gwen came out and said, uh, five minutes, she yelled out five minutes." Pittman then arrived as expected, and Moore exited from an "alley part" to approach the van with a gun in his possession. At that point, Pittman, who apparently observed alarming activity, said "this motherfucker trying to kill me or something" and reached for his own gun. Moore "froze at the moment" because he was not expecting Pittman to have a gun available. Moore fired one shot at Pittman and ran away. Pittman returned fire and struck Moore in the butt. While this was happening, "Sammy," who also was involved in the robbery, fired about 15 or 20 shots from his "AK" at Pittman and his van. Sammy then drove Moore to the Receiving Hospital, not the nearby Henry Ford, because Moore did not want to be at the same hospital as Pittman and allow the police to "put two and two together." At Receiving Hospital, Moore lied to the police about how and where he had been shot.

On cross-examination, Moore acknowledged that during his discussions about the robbery, he never heard defendant's name mentioned. In fact, Moore said that he did not even know defendant. Moore never had discussions about dividing the proceeds with a fifth person.

---

[3] Christian later testified that Poochie was an older woman and essentially her "God Mom."

Christian testified that she pleaded guilty to second-degree murder, conspiracy to commit armed robbery, and armed robbery, for which she collectively received a sentence of 13 to 28 years in prison. In addition, she agreed to testify against the other participants in this matter. Christian explained that she began to associate with defendant a few years ago because "[w]e was buying pills from the same people and he was selling pills." Defendant had a relationship with Pittman whereby defendant would both buy from and sell to Pittman, depending on when defendant would "bust a script."[4]

Christian testified that at some point in the winter of 2018, defendant joked about robbing Pittman. Later, defendant "said that Pittman had got over on him and that he was being greedy and, like, he made it seem to me like Pittman had took something from him or got over on him about it and he wanted it back." Possibly, defendant was frustrated that Pittman had raised his pill prices. Eventually, Christian became interested in the robbery when defendant explained that he was going to give some of the money to Christian and Poochie, and the pills would go to Robinson, with whom Christian had a daughter. At some point during these discussions, defendant explained that he knew when Pittman would have the most money and "big shipments" of pills in his possession.[5] Defendant also explained that Pittman had been robbed before and carried a gun. Defendant told Christian that "he didn't want his hands on it, like to be firsthand," so he asked Christian whether she knew somebody "because of the type of neighborhood [she] live[s] in." Defendant mentioned Brian as a possibility, but Christian rejected that suggestion because Brian and his cousins were "already under the police radar for doing things like break-ins." Nonetheless, Christian later approached Brian and Darnell to arrange the robbery. Brian and Darnell agreed to do so, but only in a joking manner.

Christian testified that at some point shortly thereafter, Robinson asked her why defendant "keep coming around the house," and she told him about the potential robbery. Robinson then agreed to conduct the robbery with an accomplice of his choosing. A few days or weeks after Robinson agreed to conduct the robbery, he apparently selected Moore as his accomplice. Christian, Robinson, and Moore then discussed a plan whereby the robbery would occur near Poochie's house. On the night in question, Pittman arrived at Poochie's house, and Christian and Poochie exited the house and approached his van. At that point, Moore and "somebody else ran up and then the robbery took place." As Moore testified earlier, a shootout occurred, and Christian ran back into the house to call 911. She also called defendant.

Christian testified that the police arrived at the scene shortly thereafter and, while the police were investigating the shooting, defendant arrived at the scene as well because she "had called him and told him what happened." Simply put, Christian told defendant during the brief phone call that "[o]verall Pittman got shot and everything went wrong and [defendant] said he was on his way." After he arrived, defendant was able to enter the house despite the police perimeter, and he moved the pills to a different location in the house. Defendant told Christian, "don't mention 'em,

---

[4] The implication of Christian's testimony is that defendant was, at most, a low-level pill seller, whereas Pittman himself was a higher-level pill seller.

[5] While not entirely clear from her testimony, Christian implied that the conspirators actually used this information to determine when to rob Pittman.

don't say nothing." Eventually, after questioning Christian and Poochie, the police left the scene, and the following occurred:

> Um, Malik told me and Poochie that he would bring us some money or something tomorrow, and, like, he gone take care of everything – everything gone be okay. And he told Poochie to get some garbage bags so that she could put the pills in it because he was taking them with him.

Defendant then drove Christian home with the pills in his possession. During the drive home, or possibly a few hours later, defendant told Christian that he was going to sell some of the pills, give Christian, Poochie, and Moore some of the money, and give some of the pills to Robinson.

Christian testified that on February 8, 2019, a police sergeant interviewed her and confronted her with the fact that he knew that somebody stole pills from Pittman. Christian told the police sergeant that defendant had the pills, which she estimated was about 300 bottles. After the interview, Christian called defendant and "might have" told him that she informed the police that he had the pills. In the following days, defendant expressed concern that Pittman's family would kill both he and Christian.

Detroit Police Lieutenant Erik Peterson testified that he interviewed defendant on February 9 and September 5, 2019. The prosecution showed the video recordings of part or all of those interviews to the jury while Lieutenant Peterson and another officer narrated.[6] At one point, Lieutenant Peterson explained, defendant said that he disposed of the pill bottles because he was worried about his fingerprints being on the bottles.[7] Lieutenant Peterson also testified about the

---

[6] The transcript is not entirely clear in this regard.

[7] During its closing argument, the prosecution summarized some of defendant's statements as follows:

> He says – he took the pills – he took the pills out of the bottle because he didn't want his fingerprints on anything. That doesn't make sense. The bottles were in the bag. Why would you even take them out of the bag if you weren't going to sell them?

> Now, he did, in fact, go home or wherever he was searching what the various pills are. Now he threw the bags away because he didn't want his hands on anything.

> Why if you are such a good friend of Mr. Pittman's, you are a trusted member of his inner circle, why do you need to destroy the evidence?

* * *

-5-

communications history of defendant's cellular phone. For example, Lieutenant Peterson explained that defendant made several calls to individuals involved in this matter in the hours and days after the shooting. His testimony in this regard was reiterated and reinforced by Detroit Police Sergeant Melanie O'Rourke, who performs forensic analyses of cellular records.

As noted, the jury found defendant guilty of conspiracy to commit armed robbery and not guilty of the three remaining charges. The SIR, as originally calculated, provided for a minimum sentence between 51 to 85 months in prison. This incorporated scores of zero points for OV 1 and 25 points for OV 3, for an OV total of 75. However, at sentencing, and despite defense counsel's arguments to the contrary, the trial court agreed with the prosecution that OV 1 should be scored at 25 points because at least one defendant discharged a weapon during the robbery, and with the prosecution that OV 3 should be scored at 100 points because doing so did not impermissibly consider acquitted conduct. These two adjustments resulted in an OV total of 175 points, which changed the guidelines range to 108 to 180 months in prison. The trial court ultimately sentenced defendant to a minimum of 120 months in prison, stating that "a sentence within the guidelines is necessary in order to punish you and also deter you and others from committing similar crimes."

This appeal followed. Additional facts will be set forth below as necessary.

## II. BRIEF ON APPEAL

### A. SUFFICIENCY OF THE EVIDENCE

Defendant first argues that the prosecution submitted insufficient evidence to prove the offense of conspiracy to commit armed robbery beyond a reasonable doubt. We disagree.

"This Court will review a challenge to the sufficiency of the evidence de novo." *People v Montague*, 338 Mich App 29, 44; 979 NW2d 406 (2021). "The evidence is reviewed in a light most favorable to the prosecutor to determine whether any trier of fact could find the essential elements of the crime were proven beyond a reasonable doubt." *Id*. (quotation marks and citation omitted).

"It is a fundamental principle of our system of justice that an accused's guilt must be proved beyond a reasonable doubt to sustain a conviction." *People v Prude*, 513 Mich 377, 384; 15 NW3d 249 (2024) (quotation marks and citation omitted). "Accordingly, a conviction that is not supported by sufficient evidence to prove guilt beyond a reasonable doubt violates due process and cannot stand." *Id*. "Yet reversing a guilty verdict on the basis that there was insufficient evidence is a high bar to overcome." *Id*. at 384-385. "A reviewing court is required to draw all reasonable inferences and make credibility choices in support of the jury verdict." *Id*. at 385 (quotation marks and citation omitted). "This standard of review is deferential to the fact-finder

---

*He says, well, I wrapped them up and put them in the bag. I threw away the original cases because my fingerprints were on them and he said he disposed of the motherfuckers all over the neighborhood.* [Emphasis added.]

-6-

that weighed the evidence to determine the criminal defendant was guilty beyond a reasonable doubt." *Id*.

MCL 750.157a provides, in relevant part, that "[a]ny person who conspires together with 1 or more persons to commit an offense prohibited by law, or to commit a legal act in an illegal manner is guilty of the crime of conspiracy . . . ." "The gist of conspiracy lies in the illegal agreement; once the agreement is formed, the crime is complete." *People v Seewald*, 499 Mich 111, 117; 879 NW2d 237 (2016) (quotation marks and citations omitted). "Michigan law requires no proof of an overt act taken in furtherance of the conspiracy. And, because the crime is complete upon the conspirators' agreement, the prosecution need not prove that the purpose contemplated by the unlawful agreement was accomplished." *Id*. (quotation marks and citation omitted). "Conspiracy is a specific-intent crime, because it requires both the intent to combine with others and the intent to accomplish the illegal objective." *People v Mass*, 464 Mich 615, 629; 628 NW2d 540 (2001). "Thus, although the government need not prove commission of the substantive offense or even that the conspirators knew all the details of the conspiracy, it must prove that the intended future conduct they agreed upon includes all the elements of the substantive crime." *Id*. at n 19 (cleaned up).

"[D]irect proof of agreement is not required, nor is proof of a formal agreement necessary. It is sufficient that the circumstances, acts, and conduct of the parties establish an agreement." *People v Cotton*, 191 Mich App 377, 393; 478 NW2d 681 (1991). "A conspiracy may be proven by circumstantial evidence or may be based on inference." *Id*.

The elements of armed robbery are as follows:

(1) the defendant, in the course of committing a larceny of any money or other property that may be the subject of a larceny, used force or violence against any person who was present or assaulted or put the person in fear, and (2) the defendant, in the course of committing the larceny, either possessed a dangerous weapon, possessed an article used or fashioned in a manner to lead any person present to reasonably believe that the article was a dangerous weapon, or represented orally or otherwise that he or she was in possession of a dangerous weapon. [*People v Chambers*, 277 Mich App 1, 7; 742 NW2d 610 (2007) (footnote omitted).]

"In the course of committing a larceny" is defined, in turn, as including "acts that occur in an attempt to commit the larceny, or during commission of the larceny, or in flight or attempted flight after the commission of the larceny, or in an attempt to retain possession of the property." MCL 750.530(2).

Here, the prosecution submitted sufficient evidence to prove the offense of conspiracy to commit armed robbery beyond a reasonable doubt. In particular, the evidence showed that defendant and Christian agreed to commit a larceny against Pittman by using force or violence with a gun. See MCL 750.157a and MCL 750.529. Christian testified that defendant repeatedly mentioned to her the possibility of robbing Pittman. Eventually, she became interested when defendant provided more details about the possible robbery, such as who would receive the pills and money, when Pittman would have an above-average amount of pills and money in his possession, and the fact that Pittman had been robbed before and had a gun in his possession.

Christian acted upon these discussions when she mentioned the possible robbery to Robinson and others and sought someone to use a gun in the robbery. The fact that Christian acted upon her discussions with defendant in such a manner suggests that defendant and Christian had, at a minimum, some type of informal agreement to rob Pittman. See *Cotton*, 191 Mich App at 393. And, the fact that defendant told Christian that Pittman possessed a gun because he had been robbed before suggests that the forthcoming robbery of Pittman would be armed in nature.

Moreover, the facts shortly after the robbery and shooting itself reinforce that defendant and Christian had an agreement to rob Pittman. Specifically, Christian called defendant after she called 911 to inform defendant that the robbery did not occur as planned. Defendant promptly arrived at Poochie's house, where the robbery occurred, and removed the pills from the scene. The fact that Christian arranged for defendant, and not someone else involved in this matter, to remove the pills from the scene further reinforces that defendant and Christian had an agreement to rob Pittman and allow defendant to retain at least some of the robbery proceeds. In other words, defendant was not merely involved in this overall crime as the person who solicited it in the first instance. Rather, he was understood, at least by Christian, as being involved throughout the entire process by retaining or disposing of at least some of the robbery proceeds.

To summarize, the evidence was sufficient to show that defendant and Christian entered into an agreement to rob Pittman of pills and money. Moreover, given the fact that defendant informed Christian that Pittman had been robbed before and possessed a gun, and the fact that Christian subsequently asked others about using a gun in the robbery, shows that the agreement between defendant and Christian encompassed the use of force or violence with a gun during the robbery. These facts, taken together, satisfy the elements of conspiracy under MCL 750.157a and armed robbery under MCL 750.529, such that defendant was guilty of conspiracy to commit armed robbery.

## B. OV 3

Defendant argues that the trial court erred by scoring OV 3 at 100 points. Specifically, defendant argues that it is speculative to find that Pittman would not have been shot and killed, but for defendant's mere inquiry of Christian whether she knew anyone who could effectuate the robbery. Thus, defendant argues, the factual causation requirement of OV 3 was not satisfied. We disagree.

This Court reviews de novo the interpretation and application of the sentencing guidelines. *People v McGraw*, 484 Mich 120, 123; 771 NW2d 655 (2009). However, "the circuit court's factual determinations are reviewed for clear error and must be supported by a preponderance of the evidence." *People v Hardy*, 494 Mich 430, 438; 835 NW2d 340 (2013). "Clear error is present when the reviewing court is left with a definite and firm conviction that an error occurred." *People v Buie*, 491 Mich 294, 315-316; 817 NW2d 33 (2012) (quotation marks and citation omitted).

The statute governing OV 3, MCL 777.33, provides, in relevant part:

> (1) Offense variable 3 is physical injury to a victim. Score offense variable 3 by determining which of the following subdivisions apply and by assigning the

-8-

number of points attributable to the applicable subdivision that has the highest number of points:

> (a) A victim was killed . . .                                    100 points

> \* \* \*

> (2) All of the following apply to scoring offense variable 3:

> \* \* \*

> (b) Score 100 points if death results from the commission of a crime and homicide is not the sentencing offense.

The term "results from" in MCL 777.33(2)(b) "contemplates factual causation." *People v Laidler*, 491 Mich 339, 344-345; 817 NW2d 517 (2012). "Because the Legislature in MCL 777.33(2)(b) used the phrase '*results* from the commission of a crime,' it is clear that the defendant's criminal actions must constitute a factual cause of a death for purposes of OV 3." *Id*. at 345. "There is nothing in MCL 777.33 that suggests that there may be only a single cause of a death." *Id*. at 346.

In addition to the factual-causation requirement, as a general rule, "the offense variables are scored by reference only to the sentencing offense, except where specifically provided otherwise." *People v McGraw*, 484 Mich 120, 129; 771 NW2d 655 (2009). OV 3 is one such offense variable that is scored only by reference to the sentencing offense. *People v Mushatt*, 486 Mich 934, 934 (2010).[8]

---

[8] Defendant does not argue that OV 3 cannot be scored here because the crime of conspiracy to commit armed robbery was completed before the robbery and shooting itself. Regardless, we note that "the temporal dimension of the conspiracy . . . continues until the common enterprise has been fully completed, abandoned, or terminated." *People v Bushard*, 444 Mich 384, 394; 508 NW2d 745 (1993). Thus, scoring OV 3 on the basis of events that occurred after the conspiracy agreement itself is reached does not violate the *McGraw* principle, so long as the factual causation aspect is satisfied. See *People v Hill*, unpublished per curiam opinion of the Court of Appeals, issued October 17, 2013 (Docket No. 311756), at 7-8. "Although MCR 7.215(C)(1) provides that unpublished opinions are not binding under the rule of stare decisis, a court may nonetheless consider such opinions for their instructive or persuasive value." *Cox v Hartman*, 322 Mich App 292, 307; 911 NW2d 219 (2017).

We also note that defendant does not argue that scoring OV 3 at 100 points violates *People v Beck*, 504 Mich 605; 939 NW2d 213 (2019), because doing so relies upon acquitted conduct. However, we have upheld a 100-point score for OV 3 against a *Beck* challenge in closely similar circumstances. See *People v Barr*, unpublished per curiam opinion of the Court of Appeals, issued March 23, 2023 (Docket No. 353585), at 34 ("The trial court could thus reasonably find that, although defendant did not fire the gun or aid and abet in the commission of the offenses of which

Here, the trial court did not err by scoring OV 3 at 100 points because the evidence was sufficient to show factual causation. In particular, the trial testimony shows that defendant first floated the idea of robbing Pittman to Christian and, as explained, defendant and Christian eventually entered into a conspiracy to commit an armed robbery of Pittman. After that agreement, Christian persuaded others to actually commit that armed robbery, which resulted in Pittman's death from the shooting. It reasonably follows that but for the conspiracy between defendant and Christian, the armed robbery and death would not have occurred. That is, "death result[ed] from the commission of a crime," i.e. conspiracy to commit armed robbery. See MCL 777.33(2)(b). Moreover, there is nothing to suggest that defendant abandoned the conspiracy before the armed robbery and shooting, such that he may avoid criminal liability for the events that occurred after his abandonment. See *People v Bushard*, 444 Mich 384, 394; 508 NW2d 745 (1993). Finally, while the direct cause of death was the gunfire from Moore and "Sammy" during the robbery itself, OV 3 contemplates that there may be multiple causes of death for the purposes of scoring that variable. See *Laidler*, 491 Mich at 346. Consequently, we affirm the trial court's scoring of 100 points for OV 3.

## C. OV 1

Defendant argues that the trial court erred by scoring OV 1 at 25 points for two reasons. First, he was convicted of conspiracy, which was a crime that was completed without, and before, the discharge of a firearm. Second, there is nothing in the record to suggest that his co-offenders were assessed 25 points, contrary to MCL 777.31(2)(b), which essentially requires that all co-offenders be assessed the same number of points for OV 1. We disagree with both arguments.

The statute governing OV 1, MCL 777.31, provides, in relevant part:

(1) Offense variable 1 is aggravated use of a weapon. Score offense variable 1 by determining which of the following apply and by assigning the number of points attributable to the one that has the highest number of points:

(a) A firearm was discharged at or toward a human being or a victim was cut or stabbed with a knife or other cutting or stabbing weapon . . .        25 points

* * *

(2) All of the following apply to scoring offense variable 1:

(a) Count each person who was placed in danger of injury or loss of life as a victim.

---

he was acquitted, his criminal conduct of entering into the conspiracy was a factual cause of Younan's death. That is, it was reasonable to find that, if defendant had not planned and conspired to commit an armed robbery of Younan, Younan would not have died. This is not inconsistent with the jury's acquittal of defendant on the murder, armed robbery, and felony-firearm charges.").

(b) In multiple offender cases, if 1 offender is assessed points for the presence or use of a weapon, all offenders shall be assessed the same number of points.

OV 1, as with OV 3, is subject to the *McGraw* principle that the trial court is limited to considering the sentencing offense alone. *People v Biddles*, 316 Mich 148, 166; 896 NW2d 461 (2016).

We first note that reducing OV 1 from 25 points to zero points would not affect the calculated guidelines range, so for this reason alone, defendant is not relief for this issue. See *People v Francisco*, 474 Mich 82, 91-92; 711 NW2d 44 (2006). Regardless, this issue is meritless.

With regard to defendant's first argument, that the sentencing offense of conspiracy to commit armed robbery was completed (i.e., agreed upon) before the armed robbery and shooting itself, in *People v Robinson*, unpublished per curiam opinion of the Court of Appeals, issued February 28, 2012 (Docket No. 302274), we rejected the argument that OV 1 cannot be scored under circumstances similar to those present here:

> [I]f defendant is challenging the scoring of OV 1, 2, 12, and 13, as he did in the trial court, on the ground that they should not be scored for his conspiracy conviction because they related to conduct that occurred after the conspiracy was concluded, the argument is without merit. In the trial court defendant asserted that the conspiracy ended once the agreement was made. We, like the trial court, disagree. Although the crime of conspiracy is complete at the time the unlawful agreement is made, the conspiracy "continues until the common enterprise has been fully completed, abandoned, or terminated." [*Bushard*, 444 Mich at 394.] Therefore, the trial court properly considered the conduct that occurred during the armed robbery for purposes of scoring the OVs for conspiracy to commit armed robbery. [*Id*. at 4.]

We agree with this analysis and apply it here. Although the sentencing offense of conspiracy to commit armed robbery was complete in late 2018 or early 2019, before the actual armed robbery and shooting, see *Seewald*, 499 Mich at 117, the conspiracy itself continued until the armed robbery actually occurred and the proceeds of the robbery had been disposed of by the participants, see *Bushard*, 444 Mich at 394. As a result, the trial court was permitted to consider the fact that Pittman was shot during the armed robbery when scoring OV 1 without running afoul of the *McGraw* principle or MCL 777.31 itself.

With regard to defendant's second argument, which concerns MCL 777.31(2)(b), this Court has explained the trial court should first score the accurate number of points to the particular defendant before it, then apply that accurate number to the remaining defendants. *People v Libbett*, 251 Mich App 353, 366-367; 650 NW2d 407 (2002). If an earlier defendant has been scored an inaccurate number of points, then that inaccuracy does not control the scoring of OV 1 for subsequent defendants:

> When reading MCL 777.31 in its entirety, it is clear that the Legislature intended for the sentencing courts to first accurately determine the highest number

of points that are to be scored under MCL 777.31(1)(a)-(e) and then to assess the same number of accurately scored points to multiple offenders in the same case under MCL 777.31(2)(b). If we were to read subsection 2(b) in isolation, as defendant suggests, then we would not be giving effect to subsection 1, which requires that the court first accurately score the offense variable by assigning the defendant the highest number of attributable points that apply. MCL 777.31(1). In this case, however, it is undisputed that the five points initially assessed to Jerome were scored incorrectly because both parties and the trial court recognized that the proper score under MCL 777.31(1) and the facts of this case would be fifteen points. Accordingly, we hold that Jerome's erroneous score for OV 1 did not statutorily bind the trial court under MCL § 777.31(2)(b) to assess the same erroneous score for defendant in this case. [*Id*. at 367 (footnote omitted).]

As applied here, while defendant is correct that the record does not establish that the other offenders in this matter were assessed 25 points for OV 1, that fact is not dispositive because, for essentially the same reasons explained with regard to OV 3, "[a] firearm was discharged at or toward a human being" as a result of the sentencing offense of conspiracy to commit armed robbery. See MCL 777.31(1)(a). Consequently, 25 points for OV 1 were appropriate under the circumstances of this case regardless of how OV 1 was scored for the other offenders. See *Libbett*, 251 Mich App at 367. Therefore, we affirm the trial court's score of 25 points for OV 1.

## D. ADDITIONAL WITNESS

Defendant argues that the trial court erred by allowing the prosecution to add Herron as a witness during trial. We disagree.

"A trial court's decision to permit or deny the late endorsement of a witness is reviewed for an abuse of discretion." *People v Yost*, 278 Mich App 341, 379; 749 NW2d 753 (2008). "A trial court abuses its discretion when its decision falls outside the range of reasonable and principled outcomes." *Id*.

MCL 767.40a provides, in relevant part:

(1) The prosecuting attorney shall attach to the filed information a list of all witnesses known to the prosecuting attorney who might be called at trial . . . .

* * *

(3) Not less than 30 days before the trial, the prosecuting attorney shall send to the defendant or his or her attorney a list of the witnesses the prosecuting attorney intends to produce at trial.

(4) The prosecuting attorney may add or delete from the list of witnesses he or she intends to call at trial at any time upon leave of the court and for good cause shown or by stipulation of the parties.

Under MCL 767.40a, "[t]he prosecutor's only burden of production is to produce those witnesses it intends to call, a list that can be amended on good cause shown, *at any time*." *People*

-12-

*v Burwick*, 450 Mich 281, 292; 537 NW2d 813 (1995). Due diligence is not a statutory requirement. See *id*. ("The Legislature could have, but did not, condition the addition or deletion of the witnesses the prosecution would produce on a showing of prior due diligence."). Further, this Court has recognized that a late endorsement may be justified as "good cause" when a witness is not identified until the middle of trial. *People v Canter*, 197 Mich App 550, 563; 496 NW2d 336 (1992) ("Payton was not identified as a witness until the middle of the trial. This constituted good cause for the late endorsement.").

"Mere negligence of the prosecutor is not the type of egregious case for which the extreme sanction of precluding relevant evidence is reserved." *People v Callon*, 256 Mich App 312, 328; 662 NW2d 501 (2003). "Moreover, to establish that the trial court abused its discretion, defendant must demonstrate that the court's ruling resulted in prejudice." *Id*.

In this case, on the first day of trial before voir dire, the prosecution moved to add Herron as a witness, explaining that "we had secured Tracie Herron" to testify some days or weeks earlier; that defense counsel had previously been informed of this fact by the prosecution; and that defendant called Herron on the night of the robbery and shooting, so he was aware of her existence and possibility as a witness. Defense counsel responded that he was only aware of Herron a week before trial and that he did not yet have a chance to meet or interview Herron. The trial court granted the prosecution's motion, stating that "the notice provided by the People in this case was sufficient to the defense to prepare for trial," and defense counsel "can have an opportunity to meet with the witness today while we're on break and interview her and let me know if there are any further issues that come from that." The following day, after defense counsel complained that he did not have sufficient time to interview Herron, the trial court allowed him additional time.[9] Herron ultimately testified on the third day of trial.

The trial court did not abuse its discretion in this regard. The prosecution represented to the trial court that it "secured" or "found" Herron some weeks before trial, which explained the fact that Herron was not reflected on its original witness list. This representation, which generally constitutes good cause for the purposes of MCL 767.40a(4), see *Canter*, 197 Mich App at 563, was not disputed by defense counsel or the trial court.

Further, notwithstanding the "good cause" element, defendant cannot show that he was prejudiced by the trial court's ruling. See *Callon*, 256 Mich App at 328. The trial court allowed defense counsel two opportunities to meet with Herron before she testified and, more importantly, her testimony was not particularly incriminating when considered in the context of the overall trial. Rather, Herron briefly testified that Pittman had some vague, unspecified concerns with defendant, implying that Pittman was worried that defendant might rob him.[10] Herron also briefly, and

_____

[9] During this exchange, the prosecution represented that it "found" Herron the previous October and promptly informed defense counsel of this fact during plea negotiations.

[10] The morning after Herron testified, defense counsel told the trial court that "there was perjury that was committed on the stand yesterday by Tracie Herron, and I believe wholeheartedly that [the prosecution] knows that Tracie Herron committed perjury." The basis for defense counsel's assertion was that Herron testified that Pittman "feared for his safety" with regard to defendant

-13-

vaguely, testified that defendant called her the night of the shooting to falsely indicate that another person returned Pittman's pills "to the house." Such testimony was not the focus of the prosecution's case. Rather, the prosecution's case primarily concerned Christian's testimony, the fact that defendant disposed of most of the pills shortly after the robbery and shooting, and defendant's numerous inconsistent and outright false statements to the police and others in the hours and days after the shooting. Therefore, given Herron's relatively brief testimony and minor role in the overall case, defendant cannot show that he was prejudiced by the trial court's ruling that allowed her to testify.

## III. STANDARD 4 BRIEF

### A. VIDEO EVIDENCE

In his Standard 4 brief, defendant first argues that the trial court erred by granting the prosecution's motion in limine and allowing the prosecution to present to the jury the video of his September 2019 arrest. Defendant argues that admission of this video was both "unduly prejudicial" and contrary to MRE 404(b) because it implied to the jury that he "was a terrible person with a history of substance abuse which include pills and arrest for robbery." We disagree but, even if we agreed with defendant in this regard, the error was harmless.

A trial court's ruling on an evidentiary question is reviewed for an abuse of discretion. *People v Aldrich*, 246 Mich App 101, 113; 631 NW2d 67 (2001).

MRE 404(b) provides, in relevant part:

> (1) *Prohibited Uses.* Evidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.

> (2) *Permitted Uses.* If it is material, the evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, absence of mistake, or lack of accident.[11]

To determine whether evidence is admissible under MRE 404(b), courts apply the following four-part test:

---

but, apparently, Herron told defense counsel before she testified that Pittman was not "scared" of defendant. The prosecution responded that Herron might have been confused by the compound nature of defense counsel's questions, and Herron might have misunderstood "scaring" to mean "physical scared" as opposed to lack of trust. The trial court ended the discussion by simply stating, "All right. We've made a record regarding this extensively."

[11] MRE 404(b) was amended effective January 1, 2024. The trial court ruled on the motion in limine in 2023, but the trial itself occurred in 2024. We quote the version of MRE 404(b) in effect at the time of trial, although the amendments are not relevant for the purposes of this case.

First, that the evidence be offered for a proper purpose under Rule 404(b); second, that it be relevant under Rule 402 as enforced through Rule 104(b); third, that the probative value of the evidence is not substantially outweighed by unfair prejudice; fourth, that the trial court may, upon request, provide a limiting instruction to the jury. [*People v VanderVliet*, 444 Mich 52, 55; 508 NW2d 114 (1993), amended 445 Mich 1205 (1994).]

"If the prosecution creates a theory of relevance based on the alleged similarity between a defendant's other act and the charged offense, [courts] require a 'striking similarity' between the two acts to find the other act admissible." *People v Denson*, 500 Mich 385, 403; 902 NW2d 306 (2017). "When the prosecution's theory of relevancy is not based on the similarity between the other act and the charged offense, a 'striking similarity' between the acts is not required." *Id*. Thus, for example, our Supreme Court has explained that evidence of a prior conviction for possession of drugs cannot be admitted under MRE 404(b) in a case for possession with intent to deliver cocaine without some specific factual similarities between the two offenses. See *id*. at 403-404.

In this case, the prosecution recited motive and intent as proper noncharacter purposes for admission of the arrest video under MRE 404(b). This recitation satisfied the first element of the *VanderVliet* test. See *id*. at 398-399.

With regard to the second element of the *VanderVliet* test, while it is a closer call, we conclude that the trial court did not abuse its discretion by ruling that the arrest video was both material and probative under MRE 401 and 402 as to motive and intent. See *id*. at 399-400. For the purposes of MRE 404(b), "motive" is defined as "[c]ause or reason that moves the will and induces action. An inducement, or that which leads or tempts the mind to indulge a criminal act." *People v Hoffman*, 225 Mich App 103, 106; 570 NW2d 146 (1997) (quotation marks and citation omitted). "Motive is the moving power which impels to action for a definite result. Intent is the purpose to use a particular means to effect such result." *Id*. (quotation marks and citation omitted). Here, the prosecution asserted that defendant initiated the conspiracy to rob Pittman because defendant was aware that Pittman sold a substantial amount of prescription pills, and he wanted to seize and sell those pills for his own profit. Moreover, it was not reasonably disputed that defendant himself sold pills at a smaller scale, as both Christian and Herron testified to that effect. Thus, evidence that defendant was arrested with a small number of pills was consistent with that alleged motive for the robbery, particularly where the circumstances of his possession implied that he was not the patient actually prescribed those pills. By the same measure, evidence that defendant was arrested with a small number of pills was consistent with his alleged intent to commit a larceny of Pittman. See *Chambers*, 277 Mich App at 7.

Further, with regard to the third element of the *VanderVliet* test, the probative value was not substantially outweighed by the danger of unfair prejudice for the purposes of MRE 403. See *VanderVliet*, 444 Mich at 74-75. Both Christian and Herron testified that defendant engaged in the buying and selling of pills, and defendant himself acknowledged when being interviewed by Lieutenant Peterson that he possessed, and allegedly disposed of, at least some of the pills that were taken from Pittman during the robbery and shooting. Thus, the fact that defendant was arrested with a small number of pills in his possession did not inject extraneous or unexpected issues into trial. That is, the jury would have been aware that defendant engaged in the buying,

selling, and possession of pills regardless of whether the video of his arrest was shown to the jury. Consequently, the arrest video did not create any unfair prejudice that would substantially outweigh its probative value.

Finally, with regard to the fourth element of the *VanderVliet* test, the trial court provided a routine limiting instruction to the jury during its final jury instructions. See *id*. at 555.

For these reasons, the trial court did not abuse its discretion by admitting the arrest video, and accompanying police testimony, under MRE 404(b). Regardless, even if the trial court did abuse its discretion, defendant is not entitled to relief because he cannot show that the error was outcome-determinative. See *People v Lukity*, 460 Mich 484, 495; 596 NW2d 607 (1999). As explained, Christian, Herron, and defendant himself acknowledged that he engaged in some type of low-level pill possession. Moreover, the overall trial was rife with references to pill dealing and possession, as Pittman was a known pill dealer, and the robbery and shooting was caused by this fact. Therefore, even if admission of the arrest video was erroneous, that error did not affect the outcome of trial. See *id*.

## B. IMPEACHMENT EVIDENCE

Defendant argues that the prosecution violated *Brady v Maryland*, 373 US 83; 83 S Ct 1194; 10 L Ed 2d 215 (1963), by failing to disclose to him the evidentiary-hearing transcripts of Lieutenant Peterson and the police interview video of Darcell Danner.[12] According to defendant, these materials could have been used to impeach those two witnesses.

Ordinarily, this Court reviews de novo whether a defendant was denied due process. *People v Scott*, 324 Mich App 459, 462; 924 NW2d 252 (2018). To the extent that this issue is unpreserved, however, we review it for plain error affecting substantial rights.[13] See *People v Burger*, 331 Mich App 504, 516; 953 NW2d 424 (2020). "To establish plain error, the defendant must establish that (1) an error occurred, (2) the error was plain—i.e., clear or obvious, and (3) the error affected substantial rights—i.e., the outcome of the lower court proceedings was affected." *Id*. (quotation marks and citation omitted). "Reversal is warranted only when plain error resulted in the conviction of an actually innocent defendant or seriously affected the fairness, integrity, or public reputation of judicial proceedings." *Id*. (quotation marks and citation omitted).

---

[12] Before trial, Lieutenant Peterson testified in a few evidentiary hearings about the cellular-phone records of defendant and Robinson. The reason for his testimony was to establish the series of contacts between individuals involved in this matter and, in the case of Robinson, to establish that Robinson's cellular phone was in the area of the robbery itself when it occurred.

[13] In his Standard 4 brief, when referring to the evidentiary hearings at which Lieutenant Peterson testified, defendant asserts that "the herein Defendant contends that he repeatedly asked his defense counsel . . . to obtain the Evidentiary Hearing Transcripts, then this attorney was then repeatedly turned down by the Trial Court and the prosecution . . . ." We are unable to corroborate this assertion. However, regardless of the standard of review, defendant is not entitled to relief for this issue.

"The Supreme Court of the United States held in *Brady* that 'the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.' " *People v Chenault*, 495 Mich 142, 149; 845 NW2d 731 (2014), quoting *Brady*, 373 US at 87. To establish a *Brady* violation, "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Chenault*, 495 Mich at 149-150 (quotation marks and citation omitted). To establish prejudice, i.e., materiality, "a defendant must show that there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id*. at 150 (quotation marks and citation omitted). "[T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Kyles v Whitley*, 514 US 419, 437; 115 S Ct 1555; 131 L Ed 2d 490 (1995). The defendant bears the burden of showing a *Brady* violation. See *People v Schumacher*, 276 Mich App 165, 177; 740 NW2d 534 (2007).

Defendant has failed to sustain his burden of showing any of the three *Brady* elements. With regard to the police interview video of Darcell, assuming that one exists, defendant has not shown or even alleged how that video would have aided his defense counsel's cross-examination of her. Moreover, even assuming that the video would have been favorable to him by aiding cross-examination, we are unable to ascertain, or even reasonably speculate, any prejudice. Darcell's testimony was not particularly incriminating with respect to defendant. Rather, Darcell merely testified to reinforce the connection between Christian and others involved in this matter, particularly Darcell's cousin Brian and her brother Darnell. In other words, Darcell's testimony was used by the prosecution to help explain to the jury the sequence of events that led from the initial conspiracy to the ultimate robbery and shooting. Her testimony was not significant in the overall trial.

With regard to the pre-trial evidentiary hearings involving Lieutenant Peterson, we note that this argument does not implicate *Brady* because there is nothing to suggest that such transcripts even existed before trial, so it follows that the prosecution could not have withheld this evidence from defendant. However, the indigent defendant here did have a due-process right, and perhaps an equal-protection right, to transcripts that would aid his defense. See *State v Frantz*, 316 Kan 708, 743-744; 521 P3d 1113 (2022); *People v Carroll*, 12 Ill App 3d 869, 876-877; 299 NE2d 134 (1973). But defendant must show prejudice to be entitled to relief. *Carroll*, 12 Ill App 3d at 877.

Defendant has failed to show such prejudice. He does not articulate how the evidentiary-hearing transcripts could have aided his impeachment of Lieutenant Peterson at trial. For example, defendant does not identify inconsistences between Lieutenant Peterson's pre-trial testimony and trial testimony that would have had impeachment value at trial. Further, our review of Lieutenant Peterson's pre-trial and trial testimony indicates that he generally testified about straightforward, relatively verifiable matters such as the cellular-phone numbers of the various individuals involved in this matter, or the back-and-forth between he and defendant during his police interview of defendant. Such testimony is not naturally impeached. Thus, defendant is not entitled to relief for this issue.

## C. FAILURE TO CORRECT PERJURY

Defendant argues that the prosecution committed misconduct and violated his due-process rights by failing to correct the perjured testimony of Darcell and Darnell Danner, Lieutenant Peterson, and Herron. According to defendant, these witnesses "repeatedly provided false and misleading information in a manner to implicate the herein Defendant in both the planning and execution of the arm [sic] robbery of the herein victim." We disagree.

This Court reviews de novo whether a defendant was denied due process, *Scott*, 324 Mich App at 462, but to the extent that this issue is unpreserved, we review it for plain error affecting substantial rights, *Burger*, 331 Mich App at 516.[14]

"It is inconsistent with due process when the prosecution allows false testimony from a state's witness to stand uncorrected." *People v Smith*, 498 Mich 466, 475; 870 NW2d 299 (2015). "It is well established that a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction." *Id*. at 475-476 (cleaned up). "Indeed, the prosecution has an affirmative duty to correct false testimony," and "[t]he responsibility does not cease to apply merely because the false testimony goes only to the credibility of the witness." *Id*. at 476 (quotation marks and citation omitted). However, "[t]his is not to say that the prosecutor must play the role of defense counsel, and ferret out ambiguities in his witness's responses on cross-examination." *Id*. at 477 (quotation marks and citation omitted). Rather, "when it should be obvious to the Government that the witness' answer, although made in good faith, is untrue, the Government's obligation to correct that statement is as compelling as it is in a situation where the Government knows that the witness is intentionally committing perjury." *Id*. (quotation marks and citation omitted). "A new trial is required if the uncorrected false testimony could in any reasonable likelihood have affected the judgment of the jury." *Id*. at 476 (cleaned up).

In this case, while defendant has provided a thorough discussion of the relevant caselaw, he has failed to sustain his initial burden of showing that any of the witnesses at issue provided false testimony. See *People v Thurmond*, 348 Mich App 715, 736; 20 NW3d 311 (2023) ("The defendant has the burden of demonstrating that a witness's testimony was, in fact, false."). Moreover, defendant has not even specified what perjury was committed. Rather, defendant simply named the witnesses themselves. For this reason alone, defendant is not entitled to relief for this issue.

In any event, we briefly note the following. Darcell and Darnell Danner did not provide any particularly incriminating testimony against defendant. Rather, the apparent purpose of the Danner testimony was to show the jury the sequence of events that led from the initial robbery discussion between defendant and Christian to the eventual robbery and shooting itself. Thus, even if one or both of the Danner siblings committed perjury, we doubt that defendant was prejudiced. Further, as explained earlier, Lieutenant Peterson generally testified about his police interview of defendant and the cellular-phone records of the various individuals involved in this

_____

[14] The record indicates that defense counsel argued that Herron committed perjury, but did not similarly raise that argument with regard to Darcell and Darnell Danner, or Lieutenant Peterson. Thus, this issue is preserved as to Herron but, arguably, not as to the remaining three witnesses. See *People v Layher*, 238 Mich App 573, 586-587; 607 NW2d 91 (1999). Regardless of the standard of review, however, defendant is not entitled to relief.

matter. These were easily verifiable subjects, so there is no clear basis for us to conclude that Lieutenant Peterson committed perjury in a manner that escaped the notice of the attorneys involved in this case. Finally, as with the Danner testimony, Herron's testimony was not particularly significant in the context of the overall trial. Moreover, defense counsel had a full opportunity to cross-examine her about whether and to what extent, if at all, Pittman was concerned with the possibility that defendant would rob him, and there is nothing in the record to show that any inconsistencies in her testimony amounted to outright perjury. Therefore, defendant is not entitled to relief for this issue.

## D. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant argues that his defense counsel was ineffective in the following four respects: (1) he failed to request funds for a "Telephone Forensic Expert" from the trial court, (2) he failed to request funds for a "Private Investigator to obtain Police Officer Eric Petterson Evidentiary Hearing Transcripts" from the trial court, (3) he failed to request, or otherwise seek funds to pursue, "Video Evidence of Darcell and Darnell Danner Police Arrest Interview Video," and (4) he failed to request, or otherwise seek funds to pursue, "co-defendant George Robinson trial transcripts and other co-defendant's Plea Agreement Statements, Liens, and Post Criminal History." Defendant reasons that counsel's ineffectiveness in these respects violated his due-process right to present a defense. We disagree.

"A claim of ineffective assistance of counsel is a mixed question of law and fact." *People v Petri*, 279 Mich App 407, 410; 760 NW2d 882 (2008). "A trial court's findings of fact, if any, are reviewed for clear error, and this Court reviews the ultimate constitutional issue arising from an ineffective assistance of counsel claim de novo." *Id*. However, because the trial court did not conduct a *Ginther* hearing,[15] "our review is limited to mistakes apparent on the record." *People v Cox*, 268 Mich App 440, 453; 709 NW2d 152 (2005).

"The United States and Michigan Constitutions protect a criminal defendant's right to a fair trial. US Const, Am VI; Const 1963, art 1, § 17. This includes the right to the effective assistance of counsel." *People v Isrow*, 339 Mich App 522, 531; 984 NW2d 528 (2021). "Trial counsel's performance is presumed to be effective, and defendant has the heavy burden of proving otherwise." *Id*. "To establish ineffective assistance of counsel, a defendant must show (1) that trial counsel's performance was objectively deficient, and (2) that the deficiencies prejudiced the defendant." *Id*. at 531-532 (quotation marks and citation omitted). The defendant is prejudiced when there is "a reasonable probability that, but for counsel's error, the result of the proceedings would have been different." *People v Uphaus*, 278 Mich App 174, 185; 748 NW2d 899 (2008). "[D]efendant has the burden of establishing the factual predicate for his claim of ineffective assistance of counsel . . . ." *People v Hoag*, 460 Mich 1, 6; 594 NW2d 57 (1999).

"A criminal defendant has a due process right to present a defense under the state and federal Constitutions." *People v Solloway*, 316 Mich App 174, 198; 891 NW2d 255 (2016). Further, under principles of due process, an indigent criminal defendant may be "entitled to the appointment of an expert at government expense . . . ." *People v Kennedy*, 502 Mich 206, 228;

---

[15] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

917 NW2d 355 (2018). "In particular, . . . a defendant must show the trial court that there exists a reasonable probability both that an expert would be of assistance to the defense and that denial of expert assistance would result in a fundamentally unfair trial." *Id*. (quotation marks and citation omitted).

Here, as with the previous issue, defendant has failed to sustain his burden of showing that he is entitled to relief. See *Hoag*, 460 Mich at 6; *Kennedy*, 502 Mich at 228. While defendant extensively discussed the relevant caselaw, he has not explained how defense counsel was ineffective in the four respects identified in his Standard 4 brief, nor has he explained how he was prejudiced. In any event, for the reasons already explained, we doubt that any noteworthy error or prejudice occurred with respect to the testimony of the Danner siblings and Lieutenant Peterson. Moreover, after reviewing the record, we cannot readily identify how a forensic expert in cellular-phone matters would have aided defendant.[16] In addition, our review of the record suggests that defense counsel was familiar with the proceedings involving the other perpetrators involved in this matter. For example, at an October 17, 2023 pretrial hearing, defense counsel successfully obtained an adjournment of defendant's trial because he "had just received . . . the transcripts from the trial of George Robinson and they were rather lengthy and [he] wouldn't have had enough time to thoroughly read over all of those transcripts . . . ." Accordingly, we have no basis to afford defendant relief for this issue.

## E. UPWARD DEPARTURE

Finally, defendant argues that the trial court erred by imposing an upward-departure sentence. Defendant reasons that the sentencing guidelines as reflected in the original SIR provided for a minimum term between 51 to 85 months in prison, but the trial court imposed a minimum term of 120 months in prison. According to defendant, the trial court failed to identify a substantial and compelling reason for its upward departure, and the sentence otherwise violated principles of proportionality and reasonableness. We disagree.

"A sentence that departs from the applicable guidelines range will be reviewed by an appellate court for reasonableness." *People v Lockridge*, 498 Mich 358, 392; 870 NW2d 502 (2015).[17] "[T]he proper inquiry when reviewing a sentence for reasonableness is whether the trial court abused its discretion by violating the principle of proportionality set forth in *People v Milbourn*, 435 Mich 630, 636; 461 NW2d 1 (1990), which requires sentences imposed by the trial court to be proportionate to the seriousness of the circumstances surrounding the offense and the offender." *People v Steanhouse*, 500 Mich 453, 459-460; 902 NW2d 327 (2017) (quotation marks omitted). "[C]hallenges to within-guidelines sentences are reviewed for reasonableness according to the test outlined in *Steanhouse*." *People v Posey*, 512 Mich 317, 326; 1 NW3d 101 (2023). "With regard to a within-guidelines sentence, there is a nonbinding presumption of

---

[16] We note that such an expert may have been more helpful to Robinson in his separate criminal case, as some of the pre-trial evidentiary issues concerned his alleged presence at the robbery scene as determined by cellular-phone towers.

[17] *Lockridge* replaced the substantial-and-compelling test with a reasonableness test. See *id*. at 391. We will treat defendant as raising a challenge to the reasonableness of his sentence.

proportionality." *People v Purdle (On Remand)*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 353821); slip op at 5 (quotation marks and citation omitted). "And, although a within-guidelines sentence may be disproportionate or unreasonable, the defendant bears the burden of demonstrating that their within-guidelines sentence is unreasonable or disproportionate." *Id*.

Initially, we note that defendant seemingly is mistaken about the nature of his sentence. The trial court did not depart upward. The original SIR reflecting a guidelines range of 51 to 85 months in prison was presumptively prepared by an MDOC employee before sentencing as a non-binding, preliminary basis for the trial court and the parties. In other words, the OVs and PRVs as reflected in the original SIR were subject to modification by the trial court in an upward or downward direction at sentencing, depending on the parties' respective arguments and the trial court's ultimate rulings. See generally, *People v Enlow*, unpublished per curiam opinion of the Court of Appeals, issued July 29, 2025 (Docket No. 370652). Thus, the trial court here was permitted to modify the original scores for OV 1 and OV 3 in an upward direction at sentencing, and defendant was subject to the resulting increased guidelines range of 108 to 180 months in prison. Therefore, the 120-month minimum sentence imposed on defendant was not an upward departure. Rather, it was a within-guidelines sentence.

With that in mind, we conclude that the 120-month minimum sentence was reasonable, and the trial court did not violate the principle of proportionality set forth in *Milbourn*. The 120-month minimum sentence was not only within the guidelines, but it was closer to the lower end of 108 months than the higher end of 180 months. Moreover, the record does not reveal any facts that would indicate that the 120-month minimum sentence is unreasonable or disproportionate. Rather, the record shows that the victim died because defendant initiated a conspiracy to rob him with a gun, knowing that the victim possessed a gun as well. Apparently, one of the primary reasons for defendant initiating that conspiracy was the mere fact that defendant was dissatisfied with the price of his illegally distributed pills. There are no clear mitigating facts concerning defendant or the crime itself that would warrant a minimum sentence below 120 months in prison. Therefore, under these circumstances, a 120-month minimum sentence was not erroneous.

## IV. CONCLUSION

There were no errors warranting relief. Accordingly, we affirm.

/s/ Michael J. Riordan
/s/ Colleen A. O'Brien
/s/ Adrienne N. Young

-21-